UNITED STATES of America, Appellee,

v.

COAST OF MAINE LOBSTER CO.,
INC., Defendants, Appellants.

No. 76–1498.

United States Court of Appeals,
First Circuit.

June 30, 1977.

Richard E. Valentino, Saco, Me., with whom George F. Wood and Smith, Elliott, Wood & Nelson, Saco, Me., were on brief, for defendants, appellants.

John B. Wlodkowski, Asst. U. S. Atty., Portland, Me., with whom Peter Mills, U. S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MARKEY,* Judge.

MARKEY, Judge.

Appellants, Jonathan M. Singer and Coast of Maine Lobster Co., Inc. (CMLC), were convicted of twenty-nine counts of mail and wire fraud in violation of 18 U.S.C. §§ 1341[1] and 1343[2] following a six-

---

* Of the Court of Customs and Patent Appeals, sitting by designation.

1. Section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Section 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

day jury trial.[3] Singer was sentenced to a one year term of imprisonment under each count, the terms to be served concurrently. CMLC was fined $1,000 under each count, but the fine was remitted in view of CLMC's inability to pay.

## ISSUES

The issues presented on appeal are whether the trial court erred in (1) admitting into evidence a stipulation that appellants had not filed for bankruptcy; (2) denying appellants' motion for a mistrial based on the prosecutor's interruption of defense summation and on the related jury instruction; (3) refusing a requested instruction on the legal theory of the defense; (4) presenting to the jury an altered form of indictment without resubmission to the grand jury; (5) engaging in a colloquy with the jury which coerced or unduly hastened its verdict; and (6) accepting a verdict not supported by the evidence. Finding no basis for any of appellants' assignments of error, we affirm.

## BACKGROUND

CMLC was incorporated on April 21, 1972, the articles of incorporation listing Singer as incorporator, clerk, director, and sole stockholder.

During the first weeks of June 1972, appellants conducted an extensive promotional campaign, through advertisements in prominent newspapers, primarily in southern and western portions of the United States, and through brochures mailed to individuals, offering guaranteed delivery of live Maine lobsters and clams at "irresistible prices" which included the cost of air freight. The offer was limited to the month of July 1972; orders and checks had to be received by June 18, 1972, to guarantee July delivery.

Eleven prosecution witnesses testified that they had responded to appellants' offer and mailed an order form accompanied by a check or money order for the purchase price to CMLC,[4] paying amounts varying between $39.95 and $64.45. Instead of lobsters, however, all received a lulling letter or telephone call informing them that their order could not be filled as requested, but the goods could be reordered for delivery at a later date, or the purchase price could be refunded.[5]

Inability of CMLC to deliver was blamed on an attachment of its bank account and on a theft of its operating capital. Mrs. Ichie Dozier testified that she received a telephone call from CMLC during which she was told that, as a result of the attachment and theft, the corporation would be going into bankruptcy.

Singer's bank accounts, personal and corporate, were attached on June 27, 1972, during a civil action for damages brought by Salt Water Farms, Inc. (SWF), York Harbor, Maine. SWF, also in the mail-order lobster business, based its suit on appellants' possession of several thousand preaddressed labels bearing names of prospective customers and a computer printout listing 40,000 customers' names and addresses, the labels and listing having been reported stolen from SWF in September 1971. The labels and customer list were used in carrying out appellants' promotional campaign.

On the morning of July 1, 1972, the approximate date of the first air delivery of lobsters, Singer reported to the Portland, Maine Police Department that his office safe had been peeled open, and that $23,000 in customers' money had been stolen therefrom. However, Philip McDonough, an evi-

---

3. A prior judgment against these appellants on the same charges was reversed by this court because of publicity given during the earlier trial to prosecutorial statements needlessly impugning the integrity of that trial. *United States v. Coast of Maine Lobster Co.*, 538 F.2d 899 (1st Cir. 1976).

4. Eleven counts of the indictment relate to the delivery of these checks by the Postal Service to CMLC.

5. Thirteen counts of the indictment relate to the letters or telephone calls. The remaining five counts involve the sending of order confirmations by CMLC.

dence technician whose qualifications as an expert in the field were stipulated at trial, testified that he investigated Singer's complaint and that the undisturbed coating of dust on all inside surfaces of the safe evidenced the absence of money or corporate papers in the safe at the time it was peeled open.

Regina Schueler, who worked as a secretary-office clerk for appellants from the end of May 1970 to June 30, 1972, testified that during her employment the office safe was never used and its door was always open. She testified further that her services were terminated at the end of June by Singer because "he hadn't done as well as he had expected to do," notwithstanding that daily orders were averaging $1,000.

Subpoenaed records of the corporation reflected 572 orders received by CMLC. Shippers' receipts documented that lobsters had been sent to 37 individuals. None of the eleven prosecution witnesses received either lobsters or a refund. Four of the eleven had mailed checks to CMLC on or after June 30, 1972, the day prior to the alleged theft. Singer admitted that the monies of these four witnesses could not have been included in the amount allegedly stolen from the safe on July 1, 1972.

### (1) The Stipulation That Appellants Had Not Filed For Bankruptcy

■ Under the general rule, relevancy of evidence is within the sound discretion of the trial judge, whose ruling will not be disturbed unless an abuse is shown. *United States v. Carter*, 173 U.S.App.D.C. 54, 522 F.2d 666 (1975). One element of the violation charged in the present indictment was that appellants "devised . . . [a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent . . . representations." The stipulation that neither appellant had filed for bankruptcy was clearly relevant, and thus admissible, in light of Mrs. Dozier's testimony that CMLC had told her it was going into bankruptcy. We find no

abuse of discretion in admitting the stipulation.

### (2) Interruption of Defense Summation

■ During a one-and-a-half hour defense summation, the prosecutor twice objected to counsel's "putting himself as a witness." The rule that counsel must refrain from interjecting personal beliefs into the presentation of his case, *United States v. Cotter*, 425 F.2d 450 (1st Cir. 1970), applies equally to defense counsel and prosecutors, and the prosecutor acted within his rights in raising these objections.

■ The prosecutor also objected to this statement to the jury by appellants' counsel:

> Now, the computer printout list has been right in here in this case so much, has the Defendant ever been charged with the crime for doing that? I haven't heard any evidence to that effect. None. None. And you can bet your life if he had, it would be before you.

The basis for objection was that the statement permitted a false jury inference that the government could have brought charges for other crimes but had not done so.

In response to the objection, the trial judge gave the following instruction:

> Well, Ladies and Gentlemen, I must instruct you that certain crimes are within the jurisdiction of the State Courts, certain crimes are within the jurisdiction of the Federal Court. A burglary of the type with which we are here concerned would be a matter which, if a criminal charge would be filed, would be within the jurisdiction of the State Courts in Maine and not the Federal Court.

Appellants' argument that the objection and instruction disparaged or interfered with appellants' defense are unpersuasive. Counsel resumed his summation along the same line pursued prior to the objection, and, as will appear below, appellants' theory of defense was clearly communicated to the jury in the court's general charge. The

trial court has broad discretion in controlling the scope of closing argument, *United States v. Sawyer*, 143 U.S.App.D.C. 297, 443 F.2d 712 (1971), and the trial judge's clarifying instruction was well within his discretionary powers.

### (3) *Refusal to Instruct*

Upon completion of the charge to the jury, the court refused appellants' requested instruction that "a scheme to defraud is not necessarily to be inferred from business adversity or unprofitable ventures."

Appellants contend that their theory of defense focused on exercise of poor business judgment, as opposed to a specific intent to defraud, and that the court's failure to give the requested instruction effectively precluded appellants from presenting their theory of defense to the jury. We disagree.

■ As this court pointed out in *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir. 1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969), a failure to instruct in the precise words sought by counsel is not determinative. The relevant inquiry is whether the instruction as given communicates to the jury the substance of the request.

In the present case, the court's relevant instruction was:

> If you are satisfied from the evidence beyond a reasonable doubt that as the Government contends Mr. Singer devised a scheme to defraud persons who could be induced by his promotional campaign to order lobsters from him and to make payment before delivery and that he made use of the mails or interstate telephone communications in execution of that scheme, you should find the defendant guilty. But if, on the other hand, you are not so satisfied or, it goes without saying, you believe the testimony of Mr. Singer that he acted in good faith and was prevented from fulfilling his commitments by the attachment of his bank accounts

and burglary of his office, then you should find the defendants not guilty.

The last sentence of the foregoing charge is clearly tantamount to that requested by appellants. Though expressed in terms of "good faith" rather than "business adversity," the particular events on which appellants based their defense, i. e., the attachment and burglary, were specifically mentioned. The requested reference to "unprofitable ventures" would have been inconsistent with the contention of appellants that a modest profit would have been generated had the attachment and burglary not occurred. The trial court's refusal to give the requested instruction did not in any manner prejudice appellants' defense.

### (4) *The Indictment*

■ As an aid in its deliberations, the jury was presented with a photocopy of the original indictment. The counts which had been dismissed, and upon which appellants had been acquitted in the first trial, were masked with tape prior to photocopying. The charging portion (para. sixteen) of Count I of the original indictment was also masked.[6] The masking did not alter the incorporation by reference of the other fifteen paragraphs of Count I into each of the twenty-nine counts remaining in the indictment, which appeared just as they had in the original indictment.

Appellants maintain that the changes in the indictment contravened the rule, enunciated by the Supreme Court almost a century ago in *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), that a federal indictment cannot be amended except by resubmission to a grand jury. We see no merit in this argument.

As was noted in *United States v. Dawson*, 516 F.2d 796, 801 (9th Cir.), *cert. denied*, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975):

> Although the language and rationale of *Bain* are exceptionally broad, in the considerable time that has passed since *Bain* was decided the courts have engrafted

---

**6.** Appellants noted a timely objection to the changes in the indictment by pretrial motion in accordance with Fed.Rules Cr.Proc. Rule 12(b)(2), 18 U.S.C.

several exceptions and limitations on this "no amendment rule". . . .

One such exception relates to matters of form. *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).[7]

Moreover, as pointed out in C. Wright, 1 *Federal Practice and Procedure* 274–75 (1969):

> In addition to the rule permitting amendment on matters of form, another ameliorating doctrine is the rule that a portion of an indictment that the evidence does not support may be withdrawn from the jury, and this is not an impermissible amendment, provided nothing is thereby added to the indictment, and that the remaining allegations charge an offense.[8]

Cited in support of the above rule is *Salinger v. United States*, 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926), wherein the Supreme Court held that withdrawal from the jury of parts of an indictment unsupported by the evidence was not an amendment of the indictment and "was not even remotely an infraction of the constitutional provision that 'no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury.'" *Id.* at 549, 47 S.Ct. at 175, 71 L.Ed. at 402. Thus, *Salinger* clearly authorizes the withdrawal of parts of an indictment from consideration by the jury where, as here, no evidence has been presented with respect thereto, and appellants were not prejudiced by the deletion made here.

■ Appellants further argue that the manner in which the deletions were made "would permit the jury to infer that the Defendants had been tried previously." We disagree. Any possibility of the feared inference was effectively nullified by the following instructions of the trial judge:

[T]he Indictment originally in this case, contained 42 Counts as they are called or separate charges. The Government has offered no proof with respect to thirteen of these counts, and those Counts, those thirteen Counts, were withdrawn before the trial started. These thirteen Counts are therefore not before you. They should not be discussed or considered by you and the fact they were originally in the Indictment and are not before you now should have no bearing one way or the other in your consideration, of the remaining 29 Counts of the Indictment, and for your convenience, with the agreement of the parties, we have prepared a copy of the Indictment for your use from which the thirteen Counts which are no longer before you have been withdrawn.

Nor are we persuaded that the masking of the charging portion of Count I, upon which appellants were acquitted in the previous trial, vitiated the incorporation by reference of the remainder of Count I into the other twenty-nine counts. *United States v. Shavin*, 287 F.2d 647, 650 (7th Cir. 1961).

We thus find no reversible error in the trial court's handling of the indictment.

### (5) *Alleged Coercion of the Jury*

■ The jury retired to commence its deliberations at 3:07 P.M. on Tuesday, September 28, 1976. At 11:15 P.M., the trial judge summoned counsel and told them that at 10:00 P.M. the jury foreman had been asked whether the jury might reach a verdict at a reasonable hour that evening, that the foreman had responded that he expected a verdict within the hour, and that a second inquiry had been made at 11:00 P.M. to which the foreman responded that he did not expect a verdict in the "immediate future." Counsel were also informed

---

**7.** The Supreme Court in *Russell* made reference to "the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." 369 U.S. at 770, 82 S.Ct. at 1050, 8 L.Ed.2d at 255.

By way of dicta, the 2nd Circuit disparaged masking and photocopying in *United States v. Wilner*, 523 F.2d 68 (2nd Cir. 1975).

**8.** Appellants have not alleged that anything was added to the indictment, or that the remaining allegations failed to charge an offense.

that an effort to secure nearby lodgings for the jurors had been unsuccessful.

It was proposed by the trial judge to call the jury into the courtroom, and to inquire of the foreman whether the jury had been able to agree on a verdict with respect to either defendant on one or more counts. If so, the trial judge indicated that a partial verdict would be accepted; if not, the jury would be permitted to return home for the night after having been given the appropriate cautionary instructions.

Thereupon the jury was called in and the following colloquy ensued:

THE COURT: The Court is going to inquire, first, of your Foreman, as to whether you, Mr. Foreman, feel that you can arrive at a verdict in this case within the next hour or so or whether you would prefer to go home and return tomorrow morning at, say, 10:00 o'clock, and resume your deliberations then?

THE FOREMAN: Well, we have come upon agreement on certain points and at the present time it looks like we might be able to complete it in an hour.

THE COURT: Would you prefer to attempt to do that? It is 11:30 in the evening. When I say "you," I speak through you to the entire Jury.

THE FOREMAN: We would prefer to do it tonight, I guess, your Honor.

THE COURT: Have you agreed upon your verdict as to any of the Counts?

THE FOREMAN: Yes.

THE COURT: You have? All right. Well, then, the Jury may retire and continue their deliberations and, Mr. Foreman, when you have reached the point where you feel you cannot conclude your deliberations this evening, would you send a note through the Jury Officer and we will be waiting.

The jury resumed its deliberations at approximately 11:30 P.M. and returned a verdict at 12:35 A.M., finding both defendants guilty on all counts charged in the indictment.

Though appellants entered no objection at the time, with respect to any coercive or hastening effect, they now claim that their defense was prejudiced by the quoted colloquy, arguing that the jury was being urged to reach a verdict within the hour or be prepared to drive a good portion of the night to their homes.

There is nothing in the present record to suggest disagreement among the jurors which was resolved in a rush to judgment. On the contrary, the jury foreman indicated at 10:00 P.M. that the jury was moving toward a verdict, and at 11:30 P.M., that the jury had agreed on certain points and that he thought it could arrive at a verdict within an hour. The trial judge gave no indication that a verdict must be reached,[9] much less that a verdict be reached within a specified time.[10] The jury could only have understood if it could not conclude its deliberations that night, it would return to resume the next day. Even then, the time for potential resumption was not fixed but was referred to as "say, 10:00 o'clock."

Appellants point to the speed with which the verdict was reached after the quoted colloquy, as compared with the prior period of deliberation, as indicative of a hastening effect. The foreman's statement, however, that the jury had already reached a verdict with respect to one or more of the counts, the seven prior hours of deliberations, and the basic similarity of the evidence on each count, all make it unsurprising that the verdict was reached when it was. The circumstances are fully compatible with a conjecture that the verdict would have been reached at about the same time if there had been no colloquy with the court.

9. Cf. *United States v. Flannery*, 451 F.2d 880 (1st Cir. 1971) (expressed disapproval of instruction suggesting that "the case must at some time be decided."). There was no such suggestion here, and no suggestion, implicit or otherwise, as in *Flannery*, that it was "more

important [for the jury] to be quick than to be thoughtful." *Id.* at 883.

10. Cf. *Burroughs v. United States*, 365 F.2d 431 (10th Cir. 1966) (entreating jury to strive toward a verdict by a certain time held reversible error).

Nothing of record supports appellants' speculation, implicit in appellants' argument, that jurors were motivated by self-interest in expediting their decisions. *Cf. United States v. Scallion,* 533 F.2d 903, 919–20 (5th Cir. 1976).[11] The totality of the circumstances here presented reflects an absence of coercion or hastening of the jury's verdict and the absence of reversible error in the court's colloquy.[12]

#### (6) *Evidentiary Support for Verdict*

In considering appellants' contention that the verdict was unsupported by the evidence, the determinative question is "whether a rational juror drawing reasonable inferences from the evidence viewed in the light most favorable to the government could have found guilt beyond a reasonable doubt." *United States v. Sheehy,* 541 F.2d 123, 126–27 (1st Cir. 1975).

The jury was fully entitled here to draw a rational inference that appellants misrepresented the attachment as preventing timely delivery of the lobsters. The attachment had little, if any, effect on appellants' ability to ship lobsters. Nor was the inference unwarranted that the burglary was merely a ruse employed in furtherance of an overall scheme to defraud.

The inferences permissible from the evidence severely undermine appellants' theory that the attachment and robbery were unfortunate and unforeseen setbacks encountered, in a good faith business undertaking, by one having little business acumen. Had the jury drawn these inferences, it could have reached no other conclusion than that appellants' good faith defense was unworthy of belief. The receipt of money subsequent to the robbery, followed by neither lobster delivery nor refund, could only have rendered disbelief the more inescapable.

## CONCLUSION

Appellants' arguments fail to convince us of the presence of prejudicial error of any kind.

*Affirmed.*

---

11. Evidence that some sort of compromise had been reached among the jurors to avoid returning the next day would not of itself have warranted a new trial. *United States v. Green,* 523 F.2d 229 (2nd Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976).

12. Other Circuits have found similar instruction noncoercive. See, *United States v. Peskin,* 527 F.2d 71, 84–85 (7th Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976); and *Glazerman v. United States,* 421 F.2d 547, 554 (10th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90 (1970).