**UNITED STATES of America, Appellee,**

v.

**Anthony J. PINA, Defendant, Appellant.**

Nos. 85–1657 to 85–1659, 85–1672, 85–1700, 85–1701, 85–1769 and 85–1818.

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1987.

Decided Jan. 22, 1988.

Rehearing In Banc Denied in No. 85–1818 May 9, 1988.

Kathleen A. Donahue, Cohasset, Mass., for defendant, appellant.

Mervyn Hamburg, Dept. of Justice, Washington, D.C., with whom Robert S. Mueller, III, U.S. Atty., Boston, Mass., was on brief for appellee.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Anthony Pina appeals his conviction on four counts of federal weapons violations and thirty-three charges of contempt of court. We affirm his conviction on the weapons charges. We affirm in part, modify in part, and vacate and remand in part the contempt convictions.

Appellant was arrested by Plymouth, Massachusetts police on the evening of November 1, 1984 and charged under state law with illegal possession of a revolver. On that same day, the police had received information that appellant possessed two sawed-off shotguns and a small automatic weapon at his home. Based on this information and the arrest, the police obtained a search warrant to search appellant's home. During the search, police found a disassembled Roucher shotgun and a non-functioning Remington shotgun in appellant's bedroom. The barrels and stocks of both guns had been sawed-off and the serial number of the Remington had been obliterated. Appellant was subsequently indicted and convicted in the United States District Court for the District of Massachusetts on two counts of possession of an unregistered shotgun, one count of possession of a shotgun whose serial number has been obliterated, and one count of possession of weapons by a previously convicted felon.

No federal charges were filed regarding the revolver.

Despite strong warnings from the arraignment magistrate and trial judge, and concerns voiced by the government, Mr. Pina insisted on proceeding *pro se*. As a result, his defense was extremely ineffective and he was convicted on all counts, receiving a total sentence on the weapons charges of ten years imprisonment. Appellant now raises a plethora of issues regarding alleged errors committed at his trial. Because he often failed properly to raise timely objections, we are faced with several issues now being raised for the first time on appeal. We will address in detail only those arguments of appellant which have some merit.

In addition to being ineffective, appellant's performance in defense of himself was a sorry one, demonstrative of his total disregard and contempt for orderly procedure. He consistently refused to heed instructions of the judge and continually insulted the judge and prosecutor with extremely vile language. As a result, he was cited for contempt thirty-three times. The contempt citations always were issued for disruption of trial and never directly because of insults to the judge. At seven contempt hearings, held during and after the completion of the trial, appellant was convicted on all contempt charges and received an additional 2760 days (approximately seven and one-half years) of imprisonment. Appellant claims he was denied his right to a jury trial and to due process because all contempt hearings were held without a jury and before the trial judge who was the primary target of his abusive conduct. We will address these issues after we have disposed of appellant's claims of error in his underlying trial.

## THE TRIAL

### *Waiver of Counsel*

■ Before and throughout his trial, Pina consistently and adamantly refused appointment of counsel from the public defender's office. He was allowed to proceed *pro se* only after the court had specifically warned him that, due to his incarceration, he would have limited access to legal materials.[1] Appellant contends, however, that he effectively had *no* access to legal materials. He asserts that since he was never

---

1. When a defendant refuses assistance of appointed counsel, he has no right to unqualified access to a law library or the materials therein. *United States ex rel. George v. Lane*, 718 F.2d 226 (7th Cir.1983); *United States v. Wilson*, 690 F.2d 1267, 1270–73 (9th Cir.1982), *cert. denied*, 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983). Both the court and the government specifically addressed the effect appellant's incarceration would have on his access to legal materials. At a hearing on the government's motion that the court reconsider defendant's waiver of counsel, the following exchanges occurred:

 The Government: Perhaps, your Honor would wish to inquire into his ability to represent himself in light of his currently being detained in the Plymouth County House of Detention and his purported difficulty in obtaining legal materials. I believe that his decision to go *pro se* in some fashion involves the inherent limitation upon his access to these legal materials. The government will do the best it can to provide him with those materials and be as fair as it can be, but the limitations of being in a jail cell throughout the day pose inherent limitations, and I would ask the Court to ensure that Mr. Pina is accepting this responsibility of defending himself *pro se* fully being aware of those inherent limitations.

 The Court: Mr. Pina, do you understand the question that has been raised, the subject matter that has been raised by government counsel?

 The Defendant: Yes. I understand what he said, but I am in disagreement with some of it.

 The Court: Well, all right.

 Now, I am aware that you have a number of motions pending in this matter which will be referred to the magistrate for consideration. With respect to your access to legal materials, I think that it will remain true, no matter to what extent those motions may be allowed and some special provisions may be made for your access to materials, it is, nevertheless, going to be true that you will not have as full access and as much time for access to materials as if you were entirely free and were not subject to confinement as an inmate of a correctional institution.

 Do you understand that?

 The Defendant: Yes, your Honor, I understand that.

 \* \* \* \* \* \*

 Appellant's waiver of his right to counsel, then, was with full knowledge that there would be some limitations on his access to legal materials due to his incarceration.

told that he would be denied total access to legal materials as a result of waiving counsel, the waiver was not knowing and intelligent as required by *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Furthermore, he argues that he should have received counsel upon his demand on the sixteenth day of trial.

Appellant's assertion that this limited access actually amounted to "no access" is contradicted by undisputed facts. First, counsel was appointed from the federal defender's office to provide, in the words of the court, "any requested materials that are, in the judgment of standby counsel, needed or useful in [defendant's] preparation for defense...." The defender fulfilled this role, promptly providing five of the six categories of legal materials requested by appellant.[2] In addition, appellant was transferred to Walpole State Prison, at his request, shortly before trial, so that he could utilize the law library there.

■ Clearly, appellant did not have "no access" to legal materials. Under appellant's own account of the facts, his access to legal materials was subjected only to "some limitations," precisely as he had been warned, in no uncertain terms, by the court before it accepted his waiver of counsel. Therefore, appellant knowingly and voluntarily waived counsel in light of this danger of limited access to legal materials.[3]

Despite this waiver, appellant claims the court should have appointed counsel on the sixteenth day of trial when he made a demand for counsel while being cross-examined. He indicated at that time, however, that he would not accept counsel from the public defender's office.

■ Appellant apparently fails to understand that there is no absolute right to a counsel of one's own choice; while a defendant may not be forced to proceed to trial with an incompetent or unprepared counsel, the court has no obligation to appoint a lawyer outside the public defender's office simply because a defendant believes all lawyers from that office are incompetent. *United States v. Gipson*, 693 F.2d 109, 111–12 (10th Cir.1982), *cert. denied*, 459 U.S. 1216, 103 S.Ct. 1218, 75 L.Ed.2d 455 (1983); *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir.1976). Therefore, without deciding whether, under the circumstances,[4] appellant's request otherwise would have constituted a withdrawal of his waiver of counsel, we hold that such withdrawal did not occur because of the conditions imposed by appellant on his request.

*Ineffective Standby Counsel*

■ On one occasion, a member of the public defender's office attended appellant's trial as "standby counsel." The only significant assistance actually provided by that office was to act on the defendant's requests for legal materials.[5] This counsel

---

**2.** According to appellant's brief, he requested the Rules of Criminal Procedure and Evidence, jury instructions, annotated statutes under which he was charged, the Jencks Act, cases cited by the government, and federal statutes concerning nine areas of law he considered relevant to his case. Within three days he received everything except the latter federal statutes.

**3.** We find appellant's related allegation that the court did not adequately explain other dangers and pitfalls of self-representation completely meritless. A judge is not required to give any particular form of warning prior to allowing a defendant to proceed *pro se. United States v. Hafen*, 726 F.2d 21, 25 (1st Cir.1984). All that is required is that the defendant "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*,

422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed. 2d 562 (1975) (citation omitted). We are convinced by appellant's own version of the facts that his decision to proceed *pro se* was made with eyes wide open.

**4.** The record offers substantial support for the trial court's conclusion that the defendant's request for counsel at that time was insincere and a delaying tactic.

**5.** Appellant claims that this role of the public defender prevented appellant from controlling the organization and content of his own defense as required by *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 948, 79 L.Ed.2d 122 (1984). However, as discussed above, appellant was provided with nearly all the legal materials he requested. Furthermore, he identifies no instances in which the defender's failure to provide legal materials affected either the structure or the substance of his defense.

did not undertake any part of appellant's defense. Rather, appellant complains that on one occasion the counsel actually argued against the interests of the defendant.

■ On the fifth day of trial, the court was considering granting a mistrial and ordering a new trial at which standby counsel would be assigned and would participate as necessary. The court asked the federal defender to appear and speak on the issue. The following is part of his statement:

> [G]ranting a mistrial over his objection when there might be an alternative remedy ... might create a problem if the Government were to seek to retry Mr. Pina. From what I've heard, it doesn't sound like my office being appointed as standby counsel to Mr. Pina would improve his courtroom behavior in a future trial. So I really don't have any suggestion to make on behalf of Mr. Pina.

By expressing concern over the government's ability to retry the case, the defender suggested that he was more concerned with the ultimate success of the government's prosecution than with the defendant's defense. As such, the remark could have caused a mistrial *if* the defender had been acting as defendant's counsel. In this case, however, the defender was merely a neutral officer of the court: in deference to defendant's assertions that he did not want standby counsel, the defender did not appear after the second day of trial and was present on the fifth day, at the judge's request, only for the purpose of commenting on the prospect of a retrial with standby counsel assigned. Under these facts, then, the defender was not acting as defendant's counsel, standby or otherwise, when he made the questionable statement. Therefore, since defendant was not served

by counsel, he cannot now claim ineffective service of counsel.[6]

## Denial of Mistrial Motions

■ Appellant asserts that the district court erred by failing to grant three motions for a mistrial. These motions arose because of an inadvertent comment by the judge, appellant's appearance in recognizable prison garb at trial, and exposure of three jurors to appellant while he was in shackles.

At the end of Pina's opening statement and after the court denied his request to directly question a juror whom he perceived to be confused, Pina objected, stating, "I believe I'm supposed to be entitled to a fair and impartial jury." The court responded, "No, you are not," apparently misunderstanding the defendant's statement to be that he was entitled to *voir dire* the jury. Upon a review of the record, the court realized its error and gave a clear curative instruction to the jury, emphasizing that the defendant certainly was entitled to a fair and impartial jury.

The judge's unfortunate comment is not reversible error. The comment arose from a misunderstanding, it occupied only a few seconds in a lengthy trial, it was not directed at the jury, and most importantly, it was effectively cured by an instruction to the jury which clearly delineated the defendant's rights. Under these circumstances, there was no reversible error and no mistrial was required. *See United States v. Smalley*, 754 F.2d 944, 949 (11th Cir.1985); *United States v. Martin*, 706 F.2d 263, 266 (8th Cir.1983).

■ Neither was a mistrial required due to the defendant's attire at trial, which consisted of "prison regulation" shirt,

---

6. That this was not error for purposes of *this* trial does not suggest, however, that we approve of the statement made by the public defender. "The primary, if not the only, responsibility of ... [a] public defender is to represent individual citizens in controversy with the State." *Branti v. Finkel*, 445 U.S. 507, 519, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980). It is not appropriate for the public defender's office to argue on behalf of the government against a defendant's motion for a mistrial when, if that motion is granted, the defendant could become the client of the public defender's office in a retrial. Such a situation could present the appearance that the public defender's offices was not interested in defending that defendant and thus may be the basis for a disqualification of the office from the later proceeding. This would complicate efforts to provide the defendant with adequate counsel if the mistrial is granted and retrial occurs.

jeans, and sneakers. A defendant has a constitutional right not to be *compelled* to appear in court in identifiable prison garb. *Estelle v. Williams,* 425 U.S. 501, 503–506, 96 S.Ct. 1691, 1692–1694, 48 L.Ed.2d 126 (1976). There is no claim that appellant was required to wear the prison clothing or that he ever requested alternative attire.

■■■ Similarly, exposure of the jury to a defendant in shackles does not necessarily require a mistrial. *See Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 1345–46, 89 L.Ed.2d 525 (1986); *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). "The only question we need answer" is whether the exposure "was so inherently prejudicial that respondent was thereby denied his constitutional right to a fair trial." *Holbrook,* 106 S.Ct. at 1346. Here, only three of the jurors saw the defendant in shackles and the exposure was very brief. Each of the three jurors was individually questioned by the judge and each insisted that the encounter would have no effect on their capacity to remain unbiased. They were also instructed not to discuss the matter with anyone. Under these circumstances, the exposure was not "so inherently prejudicial" as to deny the defendant a fair trial.

*Other Crimes Evidence*

On the night before his house was searched and the weapons which are the subject of the federal charges were found, appellant was arrested and charged under state law with the unlawful possession of a revolver. No federal charges were lodged against defendant regarding that gun.

During the trial below, a government witness testified that no fingerprints had been found on the shotguns taken from the defendant's home. Pina then questioned the witness regarding the names of individuals whose fingerprints had been sent to Washington, D.C. for comparison purposes. One of those individuals was James, the owner of the handgun for whose posses-

sion defendant faced the state charge. The government later successfully argued that because Pina had "opened the door" regarding the matter of the revolver, it was entitled to explain who James was and why his fingerprints had been sent to the FBI. The defendant himself further explored the revolver issue with various witnesses later in the trial. He nows claims this evidence was inadmissible "other crimes" evidence, tending only to show bad character.

■■■ When allegedly inadmissible evidence is introduced due to the actions of the party seeking to exclude it, admission of that evidence does not constitute reversible error. *All Am. Life & Casualty Co. v. Oceanic Trade Alliance Council Inc.,* 756 F.2d 474, 479 (6th Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 55 (1985); *United States v. Collins,* 690 F.2d 431, 439 (5th Cir.1982) ("A defendant cannot complain on appeal of alleged errors invited or induced by himself...."), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983); *United States v. Lerma,* 657 F.2d 786, 788 (5th Cir.1981) ("Having pursued a strategy that created a potential error at trial, [defendant] cannot seek relief from the untoward results of that strategy on appeal."), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982). In this case, appellant initiated the inquiry into the matter of the revolver by seeking the identity of the individuals whose names had been associated with the fingerprint identification aspect of the government's investigation. Once the name of James had been disclosed in the context of the defendant's question, the government was entitled to rebut the inference that James had been another suspect regarding the possession of the shotguns. We agree that the discussions regarding the revolver generally had no place in the trial below;[7] however, since the defendant began the inquiry, he cannot now complain that he was allowed to do so.[8]

7. The revolver issue was relevant only insofar as it affected the validity of the search warrant, not challenged here, used to search the defendant's home.

8. Contrary to appellant's assertions, since neither party raised a Federal Rule of Evidence 404(b) objection, it was not necessary for the court to conduct a "full-blown" Rule 404(b)

*Inflammatory Lines of Questioning*

On two occasions, the district court allowed questioning which was inflammatory and of limited probative value.

██ In one instance, the government introduced testimony regarding the uses of sawed-off shotguns, such as concealability, ease of handling, and decreased likelihood of tracing the weapon. We do not understand, nor does the government explain, how this evidence was relevant to the charges alleging possession of weapons, the only charges involved in its case. Although appellant did not object to this evidence when introduced, we nonetheless can see no legitimate reason whatsoever for the government to have pursued this clearly irrelevant line of questioning, nor for the court to have allowed it.

On another occasion, the government informed the court that it wished to question the defendant regarding an alleged threat he made against a witness. The government contended that during a recess the defendant had told the prosecutor to convey the threat to a witness whom the defendant had called and who had already given testimony on direct examination and cross-examination. The court then allowed the government to ask the defendant if he recalled telling the prosecutor to inform the witness that the defendant was "going to blow his fucking head off." The defendant objected and refused to answer the question, claiming that the government was trying to prejudice the jury against him.

██ We have previously held that "[e]vidence of threats to a witness can be relevant to show consciousness of guilt" and thus may be admissible under Fed.R. Evid. 404(b). *United States v. Monahan,* 633 F.2d 984, 985 (1st Cir.1980) (per cu-

riam). Evidence of the threat may be probative because it may show that the defendant is willing to go to extreme measures to exclude relevant evidence from trial. *Id.* On the other hand, we have also noted that "evidence of a threat to a witness should not be admitted if its probative value is 'substantially outweighed' by the danger of undue prejudice." *United States v. Rosa,* 705 F.2d 1375, 1377 (1st Cir.1983) (quoting Fed.R.Evid. 404).

██ We fail to see the probative value of the alleged threat made by the defendant in the trial below. Unlike the situation where a threat is made prior to a witness' testimony, a threat made *after* a witness has already testified does not demonstrate that the defendant is willing to take action to prevent the introduction of relevant evidence; it is simply too late for the threat to have any effect on the course of the trial. In such circumstances, any probative value of the evidence is outweighed by its inflammatory potential.

██ Despite these errors, however, we find the admission of the inflammatory evidence to be harmless beyond a reasonable doubt, since the properly admissible evidence against the defendant could lead only to a verdict of guilty. The weapons had been found in a home of which Pina was co-owner and over which he exercised primary control. They were found in a bedroom which according to the defendant's own witness was occupied exclusively by the defendant. Clothes and other personal items of the defendant were also found in that bedroom. The trial errors could not have affected the outcome of the trial in light of this evidence.[9]

## THE CONTEMPT PROCEEDINGS

The record all too clearly shows that defendant's vituperative behavior constitut-

hearing prior to admitting evidence regarding the revolver.

**9.** Appellant's other allegations of trial errors are: (1) the district court conditioned the granting of a mistrial on impermissible factors; (2) the court improperly refused to subpoena a witness; (3) the court failed to return illegally seized property; (4) the court improperly denied a continuance; (5) the government wrong-

fully was provided with the defendant's witness list; (6) a "willful blindness" jury instruction was given without adequate notice; (7) trial publicity prejudiced the jury; and (8) the evidence was insufficient to support the verdict. We have considered each of these arguments presented by appellant and find them to be without merit.

ed one of the most contumacious performances ever endured by a judge in this circuit. As Justice Douglas commented about another defendant's behavior (which, by comparison, was restrained), "He tried to be his own lawyer and what transpired was pathetic, as well as disgusting and disgraceful." *Illinois v. Allen*, 397 U.S. 337, 352, 90 S.Ct. 1057, 1065, 25 L.Ed.2d 353 (1970) (Douglas, J., concurring).

The district court, notwithstanding the exercise of extreme forbearance, was forced to issue thirty-three contempt citations and to impose consecutive sentences totaling 2760 days on those charges. The sentences were imposed at seven contempt hearings. At no time was a sentence greater than 180 days imposed for any single contempt charge. While the *total* sentences imposed at each of three contempt hearings, on August 6, 12, and 23, 1985 did not exceed 180 days, the *total* sentences imposed at hearings on August 14, 20, and 22 and September 26, 1985 were 420, 1080, 480, and 480 days, respectively. The hearings on August 23 and 26 took place after the completion of appellant's trial.[10] All contempt hearings were held without a jury and before the same judge who issued the contempt citations. We are asked to decide whether, at any of these hearings, appellant was entitled to a jury trial and whether he was entitled to a trial before a judge other than the one subject to appellant's personal attacks.

*Jury Trial*

In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court established that a defendant in any serious criminal case is entitled to be tried by jury. Conversely, no jury is required to try petty crimes. *Id.* at 160, 88 S.Ct. at 1453. Subsequent cases have established a fixed demarcation between petty and serious crimes: those crimes carrying a sentence of more than six months are serious offenses requiring a jury trial if the defendant so chooses. *See Codispoti v. Pennsylvania*, 418 U.S. 506, 512, 94 S.Ct. 2687, 2691, 41 L.Ed.2d 912 (1974); *Baldwin v. New York*, 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970). This rule is applicable to contempt proceedings, whether the punishment is meted out summarily or at the end of trial. *Codispoti*, 418 U.S. at 514–17, 94 S.Ct. at 2692–94. *See also Muñiz v. Hoffman*, 422 U.S. 454, 475–76, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975). When no penalty for contempt has been established by the legislature, a judge is free to impose a maximum six month penalty for criminal contempt without a jury trial. *Muñiz*, 422 U.S. at 476, 95 S.Ct. at 2190; *cf. In Re Dellinger*, 502 F.2d 813, 820 (7th Cir.1974) (no jury trial required since contemnors' sentences could not exceed six months), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

There is, therefore, nothing improper regarding the sentences that were imposed at appellant's first two contempt hearings, on August 6 and 12, 1985. At the first hearing, two charges for contempt occurring four days earlier were punished by suspended sentences of 10 and 20 days, respectively. One week later, at a hearing on three additional charges, the suspended sentences were revoked and additional sentences of 30, 60, and 180 days were imposed. However, 120 days were to run concurrently with the other sentences so that the total actual sentence imposed, including the revoked suspended sentences, was 180 days. Appellant, therefore, was sentenced for the equivalent of a petty

---

**10.** During the course of the trial, the following sentences were imposed: on August 6, 1985, 30 day suspended sentence for two instances of contempt on August 2; on August 12, 1985, revocation of the 30 day suspension plus 150 days of consecutive sentences (plus 120 days concurrent sentences) for three contempt citations on August 5 and 7; on August 14, an additional 420 days for three instances of cited behavior on August 9 and 12; on August 20, a total of 1080 days for nine citations on August 13, 14, and 15; and on August 22, 1985, an additional 480 days for four instances of contemptuous behavior on August 19 and 20. After return of the jury verdict, the following sentences were imposed: on August 23, 1985, 120 days for one instance of contempt on August 21; and on September 26, 1985, 480 days for three contempt citations issued on August 22 and eight citations issued August 21. (The latter included eight 180 day concurrent sentences for eight refusals to respond while on the witness stand).

offense on each of these occasions and the option of a jury trial was not required.

On the other hand, the sentencing at appellant's final contempt hearing on September 26, 1985, approximately five weeks after the end of his trial, was directly contrary to the Supreme Court's holding in *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974). That case specifically held that a contemnor must be provided the option of a jury trial on contempt charges when those charges are heard after the conclusion of the trial from which the charges arose, if the defendant may be subject to consecutive sentences cumulating in excess of six months upon conviction on those charges. *Id.* at 515–18, 94 S.Ct. at 2692–94. It is immaterial whether each individual contempt was punished by a sentence of six months or less. *Id.* at 517, 94 S.Ct. at 2693. In the case before us, appellant's hearing on September 26 occurred without a jury and approximately five weeks after the completion of his trial. At this hearing, he received eight concurrent sentences of 180 days plus consecutive sentences of 60, 60, and 180 days. The post-trial conviction on August 23 brought a sentence of 120 days. Since this post-trial total of 600 days exceeds six months and appellant was not given the option of a jury trial, *Codispoti* requires that we set aside these convictions and remand for jury trial.

A more troublesome problem is posed by appellant's contempt hearings held on August 14, 20, and 22, 1985, at which he received total sentences of 420, 1080, and 480 days, respectively. On these dates, appellant's trial was still ongoing and there was still the "overriding necessity" to preserve order.[11] *Id.* at 515, 94 S.Ct. at 2692. The issue, therefore, is not directly settled by *Codispoti*, which only prevents the imposition of consecutive sentences in excess of six months without a

jury option when the contempt hearing is held after the conclusion of the underlying trial. Instead, we must examine more closely the principles underlying the right to jury trial to determine whether a defendant has such a right any time he may be subjected to greater than six months imprisonment at any single contempt proceeding.

The right to a jury trial on contempt charges, formerly not recognized, was established by the Supreme Court in *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). The Court found that denying a jury trial to an individual accused of contempt and subjected to severe punishment was not justified by the need to preserve the efficiency, dignity, or effectiveness of the judicial process. *Id.* at 208, 88 S.Ct. at 1485. It was, instead, an unacceptable interpretation of the Constitution and an unconstitutional assumption of power by the courts. *Id.* at 198, 88 S.Ct. at 1480. The Court reasoned that there is no substantial difference between serious contempt and other serious crimes for which the option of jury trial is required; on the contrary, "in contempt cases an even more compelling argument can be made for providing a right to jury trial as a protection against the arbitrary exercise of official power." *Id.* at 202, 88 S.Ct. at 1482. The Court believed it would be unwise to allow the judiciary "untrammeled power" to punish contempt and indicated a jury could be an effective safeguard against that power's abuse. *Id.* at 207, 88 S.Ct. at 1485. It reaffirmed that serious punishment may be imparted for serious contempt, but explicitly refused to make an exception, even for courtroom misbehavior, to the rule that serious punishment cannot be imposed unless the defendant is given the option of a jury trial. *Id.* at 209, 88 S.Ct. at 1486. Similarly, the Court made criminal contempt subject to the rule that a jury is not

---

**11.** These hearings, like the earlier ones, were not summary in the traditional manner because, rather than occurring immediately upon the contempt citation, they were conducted days later. The principal reason for the delay was to make the transcripts of the allegedly contumacious behavior available to the defendant prior to the hearings. This quite commendable approach caused the "summary" sentences to be handed out en masse. Although these hearings were consolidated, they were nonetheless summary for purposes of *Codispoti* since they were intended to deter further contempt during trial.

required to try petty crimes. *Id.* at 210, 88 S.Ct. at 1486.

This principle, however, does not resolve the problem faced by a judge forced to deal with more than one instance of contumacious behavior by the same individual during the course of a trial. Justice White, writing for the plurality in *Codispoti*, provided some guidelines. First, he suggested that a judge does not "exhaust his power to convict and punish summarily whenever the punishment imposed for separate contemptuous acts during trial exceeds six months." 418 U.S. at 514, 94 S.Ct. at 2692. He indicated that the cumulative punishment for contempt imposed during the course of a trial may exceed six months if the judge acts "instantly" to deal with each contempt "as a discrete and separate matter at a different point during the trial." *Id.* at 514–15, 94 S.Ct. at 2692. The Court indicated that the "justification for dispensing with the ordinary rudiments of due process" in such a situation was due to the usefulness of the summary contempt process for advancing the "overriding necessity" of preserving order in the courtroom. *Id.* at 515, 94 S.Ct. at 2692.[12]

As noted above, however, the Court held that this rule does not extend to the situation where the judge waits until the end of trial to impose sentencing totaling more than six months for several discrete acts of contempt committed during trial. *Id.* at 515–18, 94 S.Ct. at 2692–94. In so ruling, the Court cited the "deep commitment of the Nation to the right of a jury trial in serious criminal cases" and invoked the warning in *Bloom, supra,* that an even more compelling argument can be made for providing a jury trial for serious contempts than for other serious crimes. *Id.* at 515–16, 94 S.Ct. at 2692–93. The Court noted that, because a single judge had tried the defendant on all contempt charges and imposed sentences that were to run consecutively for more than six months, the defendant had been tried on what was equivalent to a serious crime. *Id.* at 516–17, 94

S.Ct. at 2693–94. The Court specifically stated that:

> [w]e find unavailing respondent's contrary argument that petitioners' contempts were separate offenses and that, because no more than a six months' sentence was imposed for any single offense, each contempt was necessarily a petty offense triable without a jury.... *[T]he salient fact remains that the contempts arose from a single trial, were charged by a single judge, and were tried in a single proceeding.*

*Id.* at 517, 94 S.Ct. at 2693 (emphasis supplied).

It is apparent, therefore, that the Court has refused to make any exception to the rule that the right to a jury trial attaches when, in any single proceeding, a defendant is subject to total imprisonment in excess of six months. Indeed, in *Bloom,* the Court specifically considered and rejected any exception to this rule for summary contempt proceedings, stating that the power of contempt

> rests on the need to maintain order and a deliberative atmosphere in the courtroom. The power of a judge to quell disturbance cannot attend upon the impaneling of a jury. There is, therefore, a strong temptation to make exception to the rule we establish for disorders in the courtroom. We are convinced, however, that no such special rule is needed.

*Bloom,* 391 U.S. at 210, 88 S.Ct. at 1486. This refusal to make exception has been maintained. Thus, in *Codispoti,* the Court reaffirmed that, "where the necessity of circumstances warrants, a contemnor may be summarily tried for an act of contempt during trial and *punished by a term of no more than six months."* *Codispoti,* 418 U.S. at 514, 94 S.Ct. at 2692 (emphasis added); *see also Muñiz v. Hoffman,* 422 U.S. at 476, 95 S.Ct. at 2190 (the Court, *in dicta,* stated that "imprisonment for longer than six months is constitutionally impermissible unless the contemnor has been given the opportunity for a jury trial"). In

---

12. This aspect of the Court's opinion is technically a plurality since Justice Marshall's concurrence explicitly rejected this holding. It is clear from the dissents, however, that they agreed with Justice White on this point. The vote on this issue, therefore, was actually eight to one.

the case before us, the judge on three separate occasions during trial imposed sentences cumulating well in excess of six months. On each occasion, "the salient fact remains that the contempts arose from a single trial, were charged by a single judge, *and were tried in a single proceeding.*" *Codispoti,* 418 U.S. at 517, 94 S.Ct. at 2693 (emphasis supplied). The Supreme Court explicitly has refused to make any exception to the rule that the right to a jury trial attaches any time one is subject to imprisonment in excess of six months in a single sentencing proceeding; we cannot create a contrary rule of law. Therefore, the sentences imposed on August 14, 20, and 22, 1985 must be modified as discussed *post.*

*Trial Before Another Judge*

The Supreme Court, in its unanimous decision in *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), held that, when a judge is subject to personal attacks throughout the course of a trial, a different judge should preside over the contempt proceedings if those proceedings are conducted after entry of verdict on the underlying charge. In that case, the contemnor had been sentenced for eleven to twenty years in one contempt proceeding at the end of his trial. *Id.* at 455, 91 S.Ct. at 500. In court, the defendant, among other things, had called the trial judge a "dirty son of a bitch," "dirty tyrannical old dog," and "fool," and told him to "go to hell" and "keep your mouth shut." *Id.* at 466, 91 S.Ct. at 505. The Court reasoned that no judge "so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication" of the contempt charges. *Id.* at 465, 91 S.Ct. at 505. Therefore, the Court held "that by reason of the Due Process Clause ... a defendant in criminal contempt proceedings should be given a public trial be-

fore a judge other than the one reviled by the contemnor," and that under the facts of that case, the "requirement can be satisfied only if ... another judge, not bearing the sting of these slanderous remarks and having the impersonal authority of law, sits in judgment on the [contumacious] conduct...." *Id.* at 466, 91 S.Ct. at 505. *See also Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (among the "various situations [that] have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable ... are those in which the adjudicator ... has been the target of personal abuse or criticism from the party before him."); *United States v. Lumumba,* 741 F.2d 12, 16 (2d Cir.1984) ("Failing to recognize that there could be some residue of aggravation on the judge's part would be unrealistically to hold that trial judges are not also human. Therefore, the rationale for not permitting judges to sit in judgment on themselves is that not only is justice to be done, but it is also to appear to be done."). The Court in *Mayberry* issued its ruling despite recognizing that, during trial, the judge had not been "an activist seeking combat," but only a target of the defendant's "insolence." 400 U.S. at 465, 91 S.Ct. at 505. *See also Taylor v. Hayes,* 418 U.S. 488, 501–03, 94 S.Ct. 2697, 2704–06, 41 L.Ed.2d 897 (1974) (although contumacious conduct not directed personally at the judge, post-trial contempt hearing should be before a different judge when record suggests trial judge may have become involved in running controversy with contemnor).[13]

■ In the trial below, appellant's behavior was so outrageous as to make the defendants in *Mayberry* and *Taylor* look well-mannered by comparison. Appellant

**13.** It is also worth noting that three of the four dissenters in *Codispoti* based their dissent in part on the fact that a judge other than the trial judge had presided over the contempt hearing and imposed sentencing. *Codispoti,* 418 U.S. at 522–23, 94 S.Ct. at 2696 (Blackmun, J., dissenting) ("The perceived need to remove the case from the contemned judge is fully served by assigning the case to a different judge."). Al-

though Justice Rehnquist joined this dissent, his separate dissent indicates that he does not believe the trial judge should be disqualified from presiding over a contempt hearing when he has been the subject of personal attack even when the hearing occurs after conclusion of the trial. *See Codispoti,* 418 U.S. at 525–31, 94 S.Ct. at 2707–11 (Rehnquist, J., dissenting).

called the judge, among other things, "a little child," "a fucking idiot," "a sick individual," "a fucking fool," a "lying, bigot motherfucker," "a cold-blooded fucking Wizard," a "no good piece of shit," and a "no good maggot." He told the judge he "should have been a Klansman," to put his "mother in contempt ... that damn pig that brang you in this world," "to hurry up and have a fucking heart attack," to "suck my balls," and to "go fuck your mother." As in *Mayberry*, the judge "was not an activist seeking combat;" yet it is difficult to accept that, after completion of the trial, anyone "so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." [14] *Mayberry*, 400 U.S. at 465, 91 S.Ct. at 505.

■ A judge subject to such an attack is not without recourse for contumacious conduct. First, *Mayberry* indicates that a judge does not lose his summary contempt power simply because he is the object of abuse; that is, the judge may try and sentence the offender at discrete intervals *during* the trial. *Mayberry*, 400 U.S. at 463–64, 91 S.Ct. at 504. Such a power is particularly necessary when, as here, there is clear evidence that the "acts of contempt [were] palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons...." *Id.* at 465, 91 S.Ct. at 505 (quoting *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925)). Simply put, a defendant should not be allowed "to profit from his own wrong in this way." *Illinois v. Allen*, 397 U.S. at 345, 90 S.Ct. at 1062.

■ The contempt power, however, is not the only weapon available to a judge to protect the order and dignity of the courtroom in the face of an openly contumacious defendant. Indeed, because of possible notice and hearing problems, "summary contempt always, and rightly, is regarded with disfavor." *Taylor v. Hayes*, 418 U.S. at 498, 94 S.Ct. at 2703 (citation omitted). Furthermore, as this case amply demonstrates, the contempt power is of little practical value against a defendant with complete disrespect for the judicial process. *Mayberry*, 400 U.S. at 467, 91 S.Ct. at 506 (Burger, C.J., concurring); *see also Illinois v. Allen*, 397 U.S. at 345, 90 S.Ct. at 1061. Recognition of this regrettable fact led the Supreme Court to announce unambiguously that a defendant who persists in conducting himself in an extremely unruly manner loses his sixth and fourteenth amendment rights to be present throughout his trial. *Allen*, 397 U.S. at 346, 90 S.Ct. at 1062.

More is at stake at any trial than the interests of the accused: all of society is a party. *Mayberry*, 400 U.S. at 468, 91 S.Ct. at 506 (Burger, C.J., concurring). The trial judge has an obligation to maintain order and dignity so that the process can vindicate all legitimate interests. Like the unruly child whose antics are but a cry for attention and whose escalating punishment of writing on a blackboard only provides a platform on which to perform, the defendant, at times, must be sent from the classroom. Such action may be the wise course when, as here, the defendant is not at all dissuaded by the criminal contempt powers. *Allen*, 397 U.S. at 346, 90 S.Ct. at 1062. As Chief Justice Burger observed:

> [T]he standards of *Illinois v. Allen* ... would have enabled the trial judge to remove the accused from the courtroom after his first outrageous actions and words, and to summarily punish him for contempt. The contempt power, however, is of limited utility in dealing with an incorrigible, a cunning psychopath, or an accused bent on frustrating the particular trial or undermining the processes of justice. For such as these, summary removal from the courtroom is the really effective remedy. Indeed it is one, as this case shows, where removal could well be a benefit to the accused in the

---

**14.** We emphasize that the trial judge exercised admirable self-restraint by refusing to issue contempt citations on the basis of any of the defendant's personal insults. On each occasion, the judge imposed the citation when the defendant refused to honor court procedural rules

(*e.g.,* continuing to disrupt the court while the government was examining witnesses). *Mayberry* addresses the issue of even the spectre of bias at subsequent contempt proceedings due to personal insults during trial.

sense that one episode of contemptuous conduct would be less likely to turn a jury against him than 11 episodes.... [P]lainly summary removal is the most salutary remedy in cases such as this. *Mayberry,* 400 U.S. at 467, 91 S.Ct. at 506 (Burger, C.J., concurring). *See also id.* at 469, 91 S.Ct. at 506 (Justice Harlan concurring in light of trial judge's option under *Allen,* albeit unknown to the judge at the time, to bar defendant from the courtroom).

■ Removal of a defendant from the courtroom is more difficult when the defendant is acting *pro se.* We thus encourage a trial judge to employ his or her wisdom to appoint standby counsel whenever a defendant refuses or discharges counsel. 400 U.S. at 467–68, 91 S.Ct. at 506 (Burger, C.J., concurring). We agree that "[n]o circumstance ... comes to mind [that] allows an accused to interfere with the absolute right of a trial judge to have such 'standby counsel' to protect the rights of accused persons 'foolishly trying to defend themselves.'" *Id.* at 468, 91 S.Ct. at 506 (quoting Justice Douglas' majority opinion, *id.* at 462, 91 S.Ct. at 503).[15]

We also agree, however, that when faced with behavior like appellant's in the trial below, a judge's discretion should not be imprisoned "within rigid mechanical rules," *Taylor,* 418 U.S. at 500, 94 S.Ct. at 2704, and that "a fixed rule to fit every situation is not feasible...." *Mayberry,* 400 U.S. at 467, 91 S.Ct. at 506 (Burger, C.J., concurring). As Justice Black wrote:

> The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintain-

ing the appropriate courtroom atmosphere will be best in all situations. *Illinois v. Allen,* 397 U.S. at 343, 90 S.Ct. at 1061.

■ We only suggest, therefore, that a trial judge balance various factors before deciding whether to continue to cite a party for contumacious behavior or to have that party removed from the courtroom. These factors include whether the party is a defendant or counsel and thus whether removing the contemnor is a practical alternative; whether the contempt citations and sentencing are actually having any practical effect in curbing the contemptuous behavior; whether the contempt concerns conduct inside or outside the courtroom; and, if the party is the defendant, the seriousness of the charged offense and whether he or she is proceeding *pro se* or with counsel.

■ *Codispoti* has shown us that the summary contempt power is a hammer of limited size but which may be wielded more than once during the course of a trial, subject only to an abuse of discretion standard. When wielded, it may be used to impose a sentence of no more than six months unless the contemnor is afforded a jury trial. Since some hearing and notice must be provided, the sentencing need not be imposed immediately upon the occurrence of the contumacious behavior so long as the *total* sentence imposed at any one contempt hearing does not exceed six months.

■ The use of this power cannot be constrained by the defendant simply through the expediency of directing personal insults at the judge: the judge may exercise the contempt power regardless of whether he or she is the subject of attack.[16] Thus, the contempt proceedings during trial in this case were properly presided over by the trial judge. However, if the judge

---

15. Of course, when the defendant's behavior is not contumacious, the standby counsel's role must be consistent with the defendant's *Faretta* rights as discussed in *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

16. If, however, the judge becomes embroiled in an onrunning controversy with the defendant or

counsel such that the judge loses the objectivity necessary for "the impersonal authority of law," due process requires that another judge preside over the criminal contempt proceedings, even if conducted during trial. *Mayberry,* 400 U.S. at 466, 91 S.Ct. at 505.

has been the object of personal attack throughout the trial, a different judge should preside over any *post*-trial contempt proceedings. It should be emphasized that, under these rules, an unruly defendant achieves nothing by directing insults at the trial judge. The trial judge at all times retains his power of contempt, including the ability summarily to try and sentence the defendant for up to six months imprisonment upon each occurrence of contempt.[17] By using personal insults, defendant may only "gain" more contempt citations which, if not disposed of summarily, will be tried at the end of trial before another judge, and possibly a jury, with the authority to convict and sentence the defendant to the maximum sentence authorized by law for each instance of contempt. Furthermore, and perhaps most importantly, such contumacious behavior by a defendant can only severely prejudice his case before the jury.

 In the case before us, appellant's convictions and sentences for contempt on August 6 and 12, 1985 occurred during the course of trial, did not in any single proceeding exceed six months, and were reasonably calculated to control the defendant's contumacious behavior.[18] They are therefore affirmed. The convictions and sentences for contempt imposed without benefit of jury trial on August 14, 20, and 22 and September 26, 1985 exceeded six months on each occasion. These sentences must therefore be vacated. Also, the conviction on August 23, although imposing a sentence of less than six months, occurred after completion of trial before the same judge who was attacked throughout the

trial.[19] *Mayberry*, therefore, requires that this conviction be retried before another judge. As to the sentences imposed on August 14, 20, and 22, we exercise our power to modify summary contempt sentences by reducing them to 180 days for each proceeding, in accordance with *Codispoti. See Green v. United States*, 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672 (1958). We do not, however, feel that we have a similar power to modify the sentences imposed after trial on August 23 and September 26. On those dates, not only are the sentences infirm; the contempt convictions themselves are implicated because they were imposed by the same judge who had been the target of direct and continuous personal attacks during the underlying trial, and the execution of the contempt power can no longer serve to control the conduct of that trial. Should the government seek to reprosecute for the contempts adjudicated post-trial, there must be a jury trial before a different judge.

This holding in no way suggests criticism of the trial judge who performed admirably in the face of truly vile behavior. Perhaps Chief Justice Burger stated our sentiments most succinctly when he wrote:

> A review of the record warrants a closing comment on the exemplary patience of the trial judge under provocation few human beings could accept with equanimity. Our holding ... does not reflect on his performance; it relates rather to a question of procedure.

*Mayberry*, 400 U.S. at 468–69, 91 S.Ct. at 506 (Burger, C.J., concurring).

---

**17.** When the trial judge, in his or her discretion, determines that the use of the summary contempt power, limited to the imposition of a six month sentence at any one point in the trial, is ineffective in controlling the contumacious conduct and controlling the order of the proceeding, that judge may remove the party from the courtroom. If the contumacious party is a *pro se* defendant, the judge may order that standby counsel assume responsibility for presenting the defendant's defense. The trial judge at all times has the authority to appoint standby counsel regardless of the defendant's consent.

**18.** We agree, of course, that any contempt conviction and sentence may be overturned, regardless of when the contempt hearing was held or the sentence imposed, when the record clearly shows that the presiding judge harbored actual bias toward the defendant so as to prevent the fair administration of justice. *Sandstrom v. Butterworth*, 738 F.2d 1200, 1214 (11th Cir. 1984). The record reflects no such bias here.

**19.** The contempt convictions and sentencing on September 26, 1985 also occurred after completion of trial on the underlying charge so they also should have been adjudicated by an alternative judge.

The judgment of the district court on the weapons charges is *affirmed.* Appellant's convictions and sentences imposed on the contempt charges tried on August 6 and 12, 1985 are *affirmed.* The convictions of August 14, 20, and 22 are *affirmed* and the sentences imposed are *reduced to 180 days for each proceeding.* The remaining contempt convictions are *vacated and remanded for further proceedings consistent herewith.*