UNITED STATES of America, Appellee,

v.

Gjon N. NIVICA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Mark L. PEDLEY, a/k/a Jack Williams, Mark Wellington, Defendant, Appellant.

Nos. 86–1842, 86–1855.

United States Court of Appeals, First Circuit.

Heard June 5, 1989.

Decided Sept. 29, 1989.

John W. Marshall, by Appointment of the Court, with whom Homans, Hamilton, Dahmen & Marshall was on brief for defendant, appellant Gjon N. Nivica.

Robert A. Costantino, by Appointment of the Court, for defendant, appellant Mark L. Pedley.

Louis M. Fischer, Dept. of Justice, with whom Wayne Budd, U.S. Atty., was on brief for the United States.

Before BREYER, REINHARDT,[*] and SELYA, Circuit Judges.

SELYA, Circuit Judge.

"Money Makes the World Go Around" was the background music to which this farflung flim-flam was set. Centered around an offshore bank, Merchant Bank & Trust Co. (MBT), the scheme circled the globe, from Boston to the Bahamas and from Mexico to the Mariana Islands. The finale was a nineteen-count indictment against six defendants, including appellants Gjon Nivica and Mark Pedley Wellington. Following their conviction on numerous counts,[1] Nivica and Wellington appeal. We believe that the show, though ingeniously contrived, is destined to close without an encore.

## I. THE PLOT

We deem a full account of the convoluted machinations described by more than thirty witnesses over twenty-two trial days supererogatory. We start instead with a decurtate outline, to be supplemented as our discussion of specific issues may necessitate. We take the evidence as the jury could permissibly have found it, in the light most flattering to the prosecution, drawing all reasonable inferences in the government's favor. *United States v. Ingraham,*

---

[*] Of the Ninth Circuit, sitting by designation.

**1.** The indictment was variegated; not all defendants were charged in all counts. We need not recite the litany. It is enough to mention that appellants were each convicted on four counts of mail fraud, 18 U.S.C. § 1341; seven counts of wire fraud, 18 U.S.C. § 1343; three counts involving interstate transportation of stolen money, 18 U.S.C. § 2314; one count concerning interstate transportation for the purpose of executing a scheme to defraud, *id.;* and one count of racketeering, 18 U.S.C. § 1962(c). MBT was also convicted on multiple counts, and has not appealed. Brian Fisher and Suzanne Pedley were acquitted. The last named defendant, David Wellington, was not tried with the others.

832 F.2d 229, 230 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Cintolo,* 818 F.2d 980, 983 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

On September 1, 1982, Mexico nationalized its banking system, converted all dollar deposits to Mexican pesos, and restricted the exchange of pesos for dollars. The peso underwent severe devaluation. At the knock of opportunity, a black market sprang up to facilitate the conversion of pesos into dollars on terms more favorable than Mexican law permitted. Within a few weeks, David and Mark Wellington, nee Pedley, father and son,[2] launched MBT. They invested $10,000 to acquire the corporate shell from James Phillips, a lawyer practicing in the Northern Mariana Islands (where the bank was chartered). Nivica, a Massachusetts attorney, acted as MBT's general counsel and recruited the bank's first board of directors, comprising three compliant individuals who were already directors of a Bahamian bank.

Once up and running, MBT attracted custom by offering to exchange dollars or dollar-value certificates of deposit (CDs) for pesos regardless of "official" restrictions. After receiving false assurances that MBT had assets worth millions of dollars and that its CDs were backed to 135% of value, clients flocked to invest. Many were fleeced. While some of the early checks and bank drafts were paid, most of the later ones were rejected for insufficient funds. Numerous CDs issued by MBT proved worthless. The tendered pesos disappeared, sold by the promoters to a California concern. All in all, the indications are that MBT bilked its patrons of more than $6,000,000 within a few short (but costly) months.

**2.** There is surprisingly little in a name. Earlier, the Pedleys had changed their surname (legally) to Wellington. In conducting MBT business, Mark used the pseudonym "Jack Williams" and David became "Paul Johnson". To avoid confusion, we will generally refer to the son as "Wellington" and to the father as "David." We note in passing that David had four prior fraud-related convictions and that both father and son were wanted by federal authorities in 1982 in connection with a real estate swindle. *See Unit-*

In January 1983, the show folded. Wellington was arrested by Mexican authorities and his father went into hiding. This prosecution and appellants' convictions followed in due course, bringing us to the lavish banquet of ostensible errors prepared for our digestion on appeal. At most, eight items warrant discussion.[3] We deal first with two claims asserted by Nivica alone. We next address a quartet of arguments made by Wellington. We then examine a matched set of grievances pressed by both defendants.

## II. NIVICA'S INDEPENDENT CLAIMS

Defendants do not contest the legal adequacy of the government's proof that fraud was committed. Nivica, however, does challenge whether the evidence was sufficient to establish beyond reasonable doubt that he participated knowingly in the swindle. He also questions whether the trial court impermissibly shortstopped his ability to present a defense. We address these questions separately.

### A. *Sufficiency of the Evidence.*

In a fraud case, the government need not produce direct proof of defendant's scienter in order to convict. Circumstantial proof of criminal intent/guilty knowledge will suffice. *United States v. Kaplan,* 832 F.2d 676, 679 (1st Cir.1987), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988); *United States v. Cincotta,* 689 F.2d 238, 241 (1st Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). There is no pat formula for such proof; factual circumstances may signal fraudulent intent in ways as diverse as the manifestations of fraud itself. Here, we believe that the prosecution succeeded handsomely in proving scienter.

*ed States v. Wellington,* 754 F.2d 1457, 1460 (9th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 573 (1985).

**3.** Appellants, particularly Wellington, elected to lard their briefs with a salmagundi of other assertions. Having examined the lot, we summarily reject all of them as undeserving of further attention.

█ The government's evidence showed that Nivica occupied a central role in the scheme's execution. Many of MBT's worthless drafts were made on Nivica's own clients' trust account at Rockland Trust Company (Rockland) in Massachusetts. As each instrument was presented, Rockland solicited Nivica's written consent for disbursement. Nivica was well aware that the account lacked funds to pay MBT's aggregate drafts against it. He selectively authorized payment on a few occasions, but not on others. MBT paper (checks, bank drafts, wire transfers, and debt memos) drawn against Nivica's Rockland account totalled roughly $3,000,000; approximately two-thirds of it went unredeemed. The evidence supports the interpretation that Nivica stood at the center of the scheme, acting as the dispatcher who determined which instruments would be honored and which dishonored. On this basis, the jury could have found specific intent because defendant's involvement in the operations of the enterprise was so pervasive that his knowledge of its illegal nature became reasonably certain. *See, e.g., Cincotta,* 689 F.2d at 241.

█ Moreover, Nivica had ample notice that something was rotten in the Marianas. In addition to his knowledge of the rubber checks, a number of disgruntled persons—investors, depositors, and creditors—brought their complaints directly to him. Two Bahamian directors, Deighton Edwards and Walter Johnson, confronted Nivica about a check presented at Citibank for collection even though MBT had no funds there. The whole board eventually resigned because of inability to elicit a satisfactory explanation from Nivica anent the bad check. When Felipe Woloski, who was arranging currency swaps for MBT in Texas, informed the Wellingtons that MBT's checks were bouncing, he was told that Nivica would "straighten up" the transactions. Woloski called Nivica, who advised Woloski that he would "take care of it." Notwithstanding defendant's assurance, a number of these checks were never made good. Nivica gave equally sanguine guar-

antees to Victor Garcia Ventosa, an MBT customer. At time of trial, Garcia Ventosa was out of pocket some $800,000.

We need not paint the lily. These encounters were more than ample to put any reasonable person—let alone a sophisticated lawyer—on notice of the scheme. Yet, Nivica continued to participate and to offer innocent parties false assurances that the situation would be rectified. As late as the day before Wellington's arrest, Nivica told an MBT client, Ramon Sobero, "that everything was fine, that there was no problem in ... getting the money." Sobero lost $403,000. Oscar Martinez called Nivica after learning that one Wellington was in jail and the other on the lam. Nivica told him "not to worry because within a few days [an MBT officer] was going to arrive from Switzerland and that he would ... fix the whole problem." That, of course, never happened; Martinez lost $39,000. Guilty knowledge may be inferred where instances of fraud are repeatedly brought to a defendant's attention without prompting alteration of his facilitative conduct. *See, e.g., United States v. Krowen,* 809 F.2d 144, 147–48 (1st Cir.1987). In the face of unambiguous notice, Nivica's words and deeds bespoke complicity. The jury was entitled to interpret them in this vein.

There was also evidence showing that Nivica misrepresented and actively concealed material facts. He hid the true identities of "Johnson" and "Williams" while telling varying stories about their relationship to one another and their roles in MBT's operation. He assured Phillips, falsely, that he owned MBT's stock in his own right and was not operating as a "front man." [4] There was proof that Nivica knew Johnson and Williams—the true principals behind MBT—to be David and Mark Wellington; that he was aware they had been indicted on fraud charges in California; and that he knew they were fugitives from the indictment. The record is replete with evidence that Nivica strove mightily to conceal and/or dilute the force of this information. For example, he told Alan Peterson, an officer of Rockland, that

---

**4.** Nivica later told Phillips that he held the stock in trust for Suzanne Pedley.

MBT's owners and officers were associated with the Rockefeller family, and downplayed the Wellingtons' involvement (styling "Johnson" and "Williams" as MBT's "field representatives" in Mexico). During a meeting with Peterson and others, Nivica gave the audience extensive (and flattering) details about MBT's directors—neglecting to mention that, five days before, he had accepted the resignations of the entire board. His attempts to hide the truth, or cast it in a false light, were competent proof of guilty knowledge. *See, e.g., id.* at 147.

Nivica made numerous other misrepresentations. He repeatedly denied that MBT was doing business (illegally) in the United States, although many stateside transactions had been conducted with Nivica's assistance, often through his trust account. He told a federal investigator that MBT had a capitalization of $100,000 "frozen" by Citibank when, just a week earlier, he had approved a resolution paying out the entire $100,000 as compensation to four persons, including himself. (Nivica received $34,000.) This activity, too, was competent to establish knowing participation in the scheme, hence, guilt. *See, e.g., United States v. Serrano*, 870 F.2d 1, 6 (1st Cir.1989); *United States v. Urban*, 746 F.2d 1345, 1346 (8th Cir.1984) (per curiam).

To be sure, Nivica tried to explain these facts away. He attempted to pass off certain conduct as all in a day's work for corporate counsel. But, the jurors were certainly at liberty to doubt this explanation. For our part, we categorically reject any suggestion that Nivica's misrepresentations and circumambages fell within the normal range of duties of a bank's general counsel. *Cf. Cintolo*, 818 F.2d at 990 ("A criminal lawyer has no license to act as a lawyer-criminal."). Although Nivica draws attention to certain actions which he claims are consistent with a defense of good faith, the jury could justifiably have drawn an entirely different set of inferences from his overall conduct. *See id.* at 989 (jury was reasonably entitled to disbelieve defendant's testimony regarding his motives and to credit contrary interpretation urged by

government). As we have said time and again, "in a criminal case, 'the evidence need not preclude every reasonable hypothesis inconsistent with guilt' in order to sustain a conviction." *Ingraham*, 832 F.2d at 239 (quoting *United States v. Guerrero-Guerrero*, 776 F.2d 1071, 1075 (1st Cir. 1985), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986)).

The evidence we have mentioned is but the tip of the iceberg, a small part of the compendious proof which the government marshalled against this defendant. We go no further, because—notwithstanding the evidence favoring Nivica—the facts summarized above are more than adequate to show specific intent and permit a rational jury to find guilt beyond a reasonable doubt. *See Cintolo*, 818 F.2d at 983; *United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Rational jurors could certainly have inferred that Nivica knew MBT was committing fraud; that he was deeply involved in it and desirous of its success; that he had a powerful motive for abetting the scheme since his contract as general counsel promised annual compensation of $1,000,000 plus a percentage of MBT's profits; and that he went to marked lengths to hide the true facts, trying to keep the Wellingtons' identities secret and to place a veneer of regularity on a highly irregular operation. The evidence was sufficient to convict.

## B. *The Motion In Limine.*

After the government rested, defense counsel informed the district court that Nivica might testify on three points: his interview with Carney (an FBI agent); the circumstances of his first meeting with David Wellington; and the explanation he received for the Wellingtons' name changes. Counsel sought an advance ruling that, if Nivica took the stand, cross-examination would be limited to the scope of his direct and questions bearing on credibility. The district court refused this request. By testifying, the court indicated, Nivica would "open[ ] himself up to all the cross-examination that is relevant to the issue at

hand, not just the issues he chooses to present to the jury." Nivica did not testify. On appeal, he argues that the court should have granted his limitary motion. We find the argument foreclosed.

In *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), a criminal defendant asked the trial court for assurances that, if he testified, the prosecutor could not impeach him with a prior conviction. The court replied that the conviction was permissible grist for the impeachment mill. Faced with the adverse ruling, defendant chose not to testify. The court of appeals refused to consider whether the district court abused its discretion in denying the motion *in limine*, holding that defendant's failure to testify negated the point. *Luce*, 713 F.2d 1236 (6th Cir.1983). The Supreme Court agreed.

The Court offered several reasons for deciding that defendant, by opting not to testify, waived consideration of the evidence's admissibility. First, in order to balance a prior conviction's probative value against its prejudicial effect, "the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify." *Luce*, 469 U.S. at 41, 105 S.Ct. at 463 (footnote omitted). An offer of proof is not an acceptable surrogate for actual testimony in such a situation. *Id.* at 41 n. 5, 105 S.Ct. at 463 n. 5. Second, any possible harm flowing from the *in limine* ruling is "wholly speculative" because a trial court, exercising "sound judicial discretion," may always alter such rulings as the case unfolds. *Id.* at 41–42, 105 S.Ct. at 463–64. Third, absent actual testimony, there is "no way of knowing whether the Government would have sought to impeach with the prior conviction." *Id.* at 42, 105 S.Ct. at 463. Fourth, the defendant's decision to remain silent may have been due to the *in limine* ruling or may have depended upon other considerations; a reviewing court cannot tell. *Id.* Fifth, requiring a defendant to testify in order to preserve his objections makes it more difficult to " 'plant' reversible error" in the record, especially when one considers that, without a precise factual context, appellate courts cannot meaningfully review for harmless error. *Id.*

Our cases have adhered to the *Luce* model. In *United States v. Griffin*, 818 F.2d 97 (1st Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987), defense counsel was forewarned that, if he embarked on a certain line of cross-examination, the prosecution would be permitted to use "threat" evidence in rebuttal. *Id.* at 102–03. Counsel did not pursue the inquiry, but sought on appeal to raise the inadmissibility of the threats. *Id.* at 103. We held that the disputed ruling "never ripened into an appealable matter." *Id.* at 103. "Although the court telegraphed what its ruling was likely to be if defense counsel opened the door, the latter never knocked. And, we will not venture to pass upon issues such as this in a vacuum." *Id.* After rehearsing the Court's opinion in *Luce* and the principles which animated it, we concluded that "to raise and preserve for review [such a] claim ... a party must obtain the order admitting or excluding the controversial evidence in the actual setting of the trial." *Id.* at 105. *Accord United States v. Mazza*, 792 F.2d 1210, 1223 (1st Cir.1986) ("[A] criminal defendant cannot appeal this type of conditional ruling.... Rather, he must take the stand and give the court a chance to perform the required balancing in the concrete context of actual question and answer...."), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987); *see also Freeman v. Package Machinery Corp.*, 865 F.2d 1331, 1337 (1st Cir.1988) (warning that litigants must exercise caution in relying upon *in limine* rulings as the basis for preserving evidentiary objections). As an alternative, we noted that "counsel may request that the jurors retire, or ... that the actual testimony be screened *voir dire* in the jury's absence" in order to supply the necessary context. *Griffin*, 818 F.2d at 105.

■ We believe that the concerns which undergird *Luce* and *Griffin* control here. Because Nivica did not take the stand, or ask for voir dire, his exact testimony remains, in the *Luce* phrase, "unknowable." *Luce*, 469 U.S. at 41, 105 S.Ct. at 1463.

The alleged harm is "wholly speculative," *id.*, both because (a) the judge, in the give-and-take of live testimony, might have changed his mind and confined cross-examination more closely, and (b) on this record, we have no way of knowing the extent to which the government would have sought to cross-question Nivica (if at all) about other matters. Moreover, in this case as in *Luce*, there is no reliable method for divining the genesis of defendant's decision not to testify. (Surely, self-serving statements by defense counsel are not enough to clear this hurdle.) Furthermore, were we to relax the rule, we would run the very risk—ease in " 'plant[ing]' reversible error," *id.* at 42, 105 S.Ct. at 463—that the *Luce* Court aimed to avoid. Finally, defendant's tactical choice in this case, as in *Luce*, has thwarted our ability to judge the harmfulness of the asserted error. *See id.* In short, all of the pillars upon which *Luce* was constructed appear equally to underbrace the government's position in this instance.

■ Nivica attempts to distinguish *Luce* on the ground that the court below ruled *as a matter of law* that defendant's cross-examination would not be limited. He states, accurately, that testimony waives a witness' fifth amendment privilege against self-inculpation and invites cross-examination only as to topics made relevant by direct testimony. *See Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958); *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1958). Yet, the defendant never pursued this argument far enough to obtain a reviewable decision from the trial court. As can be seen, *Luce* requires the focus to be on the motion *in limine*, not on the court's response. Indeed, the very point of *Luce* is that, because defendant did not testify, appellate review of the ruling denying the *in limine* motion was foreclosed. *See also Griffin*, 818 F.2d at 105–06 (defendant, who chose not to cross-examine after hearing the trial judge's conditional ruling, "did not properly preserve the error ... for appellate scrutiny").

No matter what labels are employed, Nivica's limitary motion seems functionally indistinguishable from the exclusionary motion in *Luce* and the objection lodged in *Griffin*. None of these requests were capable of meaningful resolution in a vacuum. Ultimately, the trier's decision, whatever his initial inclination, had to depend upon particular questions and their relation to the content of the direct examination. If anything, development of a specific record seems more urgent where, as here, the defense presents a blanket request that cross-examination be curtailed. *See Freeman*, 865 F.2d at 1337 (where *in limine* motions to exclude testimony are "couched in sweeping generalities," it is "impossible to gauge their validity until an actual attempt ha[s] been made" during the trial to lay a foundation for introduction of the evidence).

Appellant, having elected not to take the stand and test the judge's pronouncement, cannot complain on appeal about its propriety.

## III. WELLINGTON'S INDEPENDENT CLAIMS

We move now to four arguments advanced by Wellington alone.

### A. *The Subpoenas.*

Late in the trial, Wellington, proceeding in *forma pauperis*, unsuccessfully submitted an ex parte application to subpoena sixteen potential defense witnesses. On appeal, he urges that the district court erred in refusing to summon six of them. We do not agree.

■ Fed.R.Crim.P. 17(b) authorizes the court to issue a subpoena upon petition of an indigent defendant if "the presence of the witness is necessary to an adequate defense." Refusal to grant subpoenas will be reversed only for abuse of discretion. *See United States v. Bibby*, 752 F.2d 1116, 1125 (6th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986); *United States v. Merrill*, 746 F.2d 458, 465 (9th Cir.1984), *cert. denied*, 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985); *Thor*

*v. United States,* 574 F.2d 215, 220 (5th Cir.1978). Given the case-specific nature of criminal trials, the district court must be afforded great latitude in weighing factors such as timeliness, materiality, relevancy, competency, practicality, and utility, as a means of determining whether a subpoena request is well founded. Because the trial judge is on the firing line and has acquired a special "feel" for the case, he is uniquely equipped to synthesize the competing demands and factors. Thus, an appellate tribunal should usually accord the trier's reconciliation of the balance considerable respect. *See Thor,* 574 F.2d at 220.

■ In this instance, we do not think the district court misused its wide discretion. Three of the putative witnesses (van Court, Bearup, and Utz) would supposedly have testified as to defendant's reasons for changing his name from Pedley to Wellington. That testimony, as the judge pointed out, was completely unnecessary. It was undisputed that the appellative switch had taken place and had been effected lawfully. The government carefully refrained from any intimation that the change had a nefarious purpose. Defendant had no right to subpoena witnesses for so peripheral a reason.

The other proffered testimony was also geared toward irrelevancies. Defendant told the trial court, for example, that Michael Cano would have testified that he was a colleague of David Wellington "and that at one point before we left for Mexico [Cano] was holding marketable securities with a value close to fifty million dollars." The import of such evidence is obscure, especially since we do not know whether Cano's dealings took place within the pertinent time frame, or had any connection with MBT. So, too, the proffered testimony of Jerry Halleuer (also spelled Hallauer, Halloway, Hallora, Halleur, Helour, and Huora at various places in the record), who "agreed to be President of [MBT] and was negotiating with the CIA to make [MBT] its front." Halleuer (however spelled) was a late arrival. As described, his evidence had no bearing on the question of Wellington's fraudulent intent at the critical (earli-

er) time. The last of the sextet, Blackman, would supposedly have testified that the Wellingtons refrained from turning themselves over to federal authorities because they wanted reasonable bail. Yet, the Wellingtons' motive for not surrendering was immaterial to their status as fugitives. On grounds of relevancy alone, the district court's action was within its discretion; none of these witnesses seems to have been "necessary to an adequate defense." Fed. R.Civ.P. 17(b).

■ Before leaving this topic, we add an eschatocol of sorts. Wellington failed to provide addresses where any of the six requested witnesses might be found. That omission comprises an independent ground sufficient to warrant rejection of his application: "Where a witness cannot be located, there is no error in denying a subpoena." *Thor,* 574 F.2d at 220; *accord Merrill,* 746 F.2d at 465; *United States v. Rodriguez,* 474 F.2d 587, 591 (5th Cir.1973); *United States v. Upchurch,* 286 F.2d 516, 518 (4th Cir.1961). Moreover, the application was untimely. Wellington waited until shortly before the government rested to make his request. He gave no reason why the subpoenas could not have been sought earlier in the proceedings, or during the months before trial. We agree entirely with the Ninth Circuit that "[a] trial court need not order a subpoena of a witness where there is inexcusable delay in the request for the order." *United States v. Jones,* 487 F.2d 676, 679 (9th Cir.1973); *accord Merrill,* 746 F.2d at 465.

### B. *The Earlier Indictment.*

In mid–1982 (shortly before MBT was formed), the Wellingtons were indicted in California. When the instant case was tried, the government offered evidence that Nivica and the remaining codefendants (Suzanne Pedley and Brian Fisher) knew of the California indictments and knew that the Wellingtons were fugitives. The government alleged that, as part of the conspiracy, Nivica and the others kept MBT's investors and customers in the dark as to these facts. Wellington argues that references to the earlier indictment consti-

tuted evidence of a "prior bad act," were more prejudicial than probative, and should have been excluded. We think not.

■ Wellington's objection mischaracterizes the realities of the trial. Since the evidence was part and parcel of the charged offense, it was independently admissible against Wellington's codefendants. *See, e.g., United States v. Garbett,* 867 F.2d 1132, 1135 (8th Cir.1989); *United States v. Dunn,* 758 F.2d 30, 38 (1st Cir. 1985). Thus, Fed.R.Evid. 404(b) had no bearing. Furthermore, the probative value of the evidence was high vis-a-vis the codefendants. Concealment of the principals' fugitive status was vital to the success of the charged conspiracy. By protecting the Wellingtons and hiding the truth, Nivica and the others could plausibly be thought to have assisted and promoted the ongoing scheme. The record makes it plain that the district judge weighed the government's proffers fastidiously, admitting the evidence only when the balance tipped in the prosecution's favor. In such circumstances, we see no reason to disrupt the lower court's careful handiwork. "Only rarely— and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman,* 865 F.2d at 1340.

■ Once it is established that the evidence was properly introduced against some of the defendants completely apart from Fed.R.Evid. 404(b), Wellington's protest is undone. On those occasions when the district court found it necessary to admit testimony mentioning Wellington's indictment or arrest, it carefully circumscribed the jury's use of that evidence.[5] We have long recognized that appropriate limiting instructions, while not a panacea, are often a suitable safeguard against the usual kinds of evidentiary spillover. *See, e.g., United States v. Rawwad,* 807 F.2d 294, 296 (1st Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *United States v. Porter,* 764 F.2d 1, 13 (1st Cir.1985). We believe the court's painstaking instructions in this case were effective to dispel any prejudice toward Wellington stemming from the challenged evidence.[6] *See Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 573–575 (1st Cir. 1989) (evidence of officer's prior misconduct admitted against officer's supervisor in joint trial; no unfair prejudice because of district court's plain, pointed, and oft-repeated limiting instructions); *United States v. Marler,* 756 F.2d 206, 216–17 (1st Cir.1985) (discussing curative effect of limiting instructions); *cf. Tierney,* 760 F.2d at 387 (evidence of defendant's indictment for unrelated offense admissible against defendant to show motive).

Ultimately, the litmus test for admission of this evidence involves whether or not the trial court exceeded its discretion. *See Onujiogu v. United States,* 817 F.2d 3, 6

---

5. To cite but a few examples, the jury was told repeatedly that it "should not, must not consider" evidence that Nivica knew of Wellington's indictment "as any indication of [Wellington's] culpability or guilt in this case." The jury was likewise told that testimony trenching upon Wellington's arrest was probative only "as to the state of mind or the intent or the knowledge of the person who spoke." In the charge itself, the trial court instructed the jurors as follows:

You have heard in certain parts of the evidence here that ... Mr. Wellington and David Wellington were in jail or in prison or under arrest or were fugitives or bail was sought or aliases were used. That evidence, if you accept it—that's entirely up to you—is not evidence of guilt of the offenses charged here. As I tried to tell you during the trial and will repeat now, we do not know the circumstances underlying that indictment or that incar-

ceration. It may be that is for something entirely divorced from any relationship to what we are doing here. It may be for an entirely different reason, and, indeed, an indictment is not a conviction, as I have just said to you. An indictment is merely a charge.

6. Because we find no reversible error, we need not comment upon the government's further contention that Wellington himself so continually injected into the case the issues of his arrest, incarceration, and indictment that he cannot now complain about the district court's admission of the prosecution's evidence. *Compare, e.g., United States v. Cresta,* 825 F.2d 538, 552 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *United States v. Chaimson,* 760 F.2d 798, 810 (7th Cir. 1985).

(1st Cir.1987). Given the material's special relevance, the district court's regardful calibration of the probative value/prejudicial impact scales, and the prophylactic measures employed below, we are confident that no abuse of discretion occurred.

### C. *Wellington's Testimony.*

Wellington claims that the district court improperly precluded him from testifying in his own behalf. The facts are these. The court appointed an attorney, Boudreau, to represent Wellington, an indigent. Wellington subsequently requested that he be allowed to serve as "co-counsel" with Boudreau. The court allowed the motion, permitting such hybrid representation on condition that Boudreau act as lead counsel.

On the fourth trial day, Wellington expressed dissatisfaction with his erstwhile prolocutor and asked to act as lead counsel, particularly to examine witnesses. During a lengthy, searching colloquy, the court pointed out the difficulties inherent in such an arrangement. The court noted that Wellington had no legal training, no knowledge of criminal procedure, and no grasp of the rules of evidence. The court also voiced concern that Wellington would heedlessly jeopardize the rights of the codefendants. The court specifically warned Wellington about potential awkwardness in acting both as trial counsel and defense witness:

> ... [I]f you take the stand ... you have to ask yourself questions.... You have to say, Mr. Wellington, what is your name. And then you say my name is Mark Wellington.... You cannot get on the stand and simply narrate your story. You have to ask questions and have answers.... [D]o you think it would be an improvement on what you can tell Mr. Boudreau to do?

Wellington then asked if Boudreau, as co-counsel, could examine him. The court rejected that idea, stating that "orderly administration of this trial" would be compromised if the defendant were allowed to "bounce back and forth" between the lead counsel role and a lesser role.

The upshot of the matter was that, when Wellington insisted, the judge, despite evident misgivings, gave provisional approval for defendant to act as lead counsel, examine witnesses, and make the opening and closing statements. Wellington was permitted to consult with Boudreau (who apparently retained authority to make legal arguments and object to the questions posed by other attorneys). Nothing further was said as to how Wellington's direct examination might be orchestrated, should he choose to testify.

The issue lay dormant until the nineteenth trial day, when Wellington announced that he would take the stand. He did not seek to have Boudreau question him, but took a different tack:

> I would like to make a special request of the Court that—something perhaps that has never been done before—what I'd like to do, instead of asking myself questions, I'd like for my jury to ask me questions.

The court denied the request, reiterating that "you will ask yourself questions and you will answer the questions, please." Wellington protested this ruling only by indirection, continuing to demand that the venire question him. The court responded: "You will take the stand under the conditions I have described or not take the stand at all."

Wellington called himself as a witness. We set forth the resultant direct examination in its entirety:

> MR. WELLINGTON: The question is: Does Mark Pedley Wellington, a/k/a Jack Williams, have anything to hide? The answer is No.
>
> [PROSECUTOR]: Objection.
>
> THE COURT: Sustained. Please strike the answer. Please wait until an objection is made, if any is made, before you answer.
>
> MR. WELLINGTON: Well, I guess I can't ask myself any more questions then.
>
> THE COURT: Thank you. You are excused.

■ 1. *Self–Interrogation.* Before us, defendant argues that the court should

have allowed Boudreau to conduct the direct examination rather than forcing defendant through the "contrived and burdensome" exercise of asking and answering his own questions. Appellant's Brief at 38. We agree that such a procedure would have been permissible. Although Boudreau had been relegated to a secondary role, he was still co-counsel. In the world of trial advocacy, it is not uncommon for a lawyer to examine one witness while co-counsel examines the next. Under ordinary circumstances, judicious use of this technique has no deleterious effect upon the orderly execution of courtroom proceedings. And, notwithstanding the important difference between two lawyers working together, and a *pro se* litigant paired with "co-counsel," *see infra*, utilizing the services of available co-counsel seems a preferable alternative to the cumbersome practice of having defendant question himself.

That said, we quickly acknowledge that appellate hindsight is always twenty-twenty. However any member of this panel might have structured the proceedings, the trial judge must be accorded a certain latitude. Our task, therefore, is not to decide whether the court below chose the best, or tidiest, means of effecting the defendant's direct examination. Rather, our inquiry is limited to whether the presider's ruling so unfairly compromised defendant's case as to abridge his sixth amendment rights, thus requiring a new trial.

We start with bedrock. Matters of trial administration are committed to the district court's discretion. *See* Fed.R.Evid. 611(a) (trial court "shall exercise reasonable control over the mode ... of interrogating witnesses"). As the advisory committee's notes to Rule 611 teach: "Spelling out detailed rules to govern the mode ... of interrogating witnesses and presenting evidence is neither desirable nor feasible. The ultimate responsibility for the effective working of the adversary system rests with the judge." We must determine, therefore, whether the court abused its discretion by imposing a mode of questioning so unwieldy that it constructively deprived Wellington of either his right to counselled assistance or his right to testify in his own defense. For several reasons, we do not believe that was the case.

■ We look first at the rather unorthodox alignment involving Wellington and Boudreau. An indigent defendant has a sixth amendment right to appointed counsel, *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963), and a corresponding right to proceed without counsel, *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975), but these are mutually exclusive. A defendant has no right to hybrid representation. *See United States v. Williams,* 791 F.2d 1383, 1389 (9th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986); *United States v. Zielie,* 734 F.2d 1447, 1454 (11th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964, 469 U.S. 1216, 105 S.Ct. 1192, 84 L.Ed.2d 338 (1985); *United States v. Daniels,* 572 F.2d 535, 540 (5th Cir.1978); *United States v. Hill,* 526 F.2d 1019, 1024–25 (10th Cir.1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976); *see generally,* 28 U.S.C. § 1654 (parties in federal court may litigate "personally *or* by counsel") (emphasis supplied). That is not to say that hybrid representation is foreclosed; rather, it is to be employed sparingly and, as a rule, is available only in the district court's discretion. We are aware of no case, federal or state, which has held a denial of hybrid representation to be an abuse of discretion or a denial of assured rights, and Wellington has directed us to none.

■ It follows, we think, that if the district court had discretion to deny hybrid representation outright, it had discretion, in granting defendant's request for hybrid representation, to place reasonable limitations and conditions upon the arrangement. *See, e.g., United States v. Williams,* 534 F.2d 119, 123 (8th Cir.) (when allowing dual representation, trial court "did not abuse its discretion in [placing] limitations ... upon defendant's participation as his own counsel"), *cert. denied,* 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). Here, Wellington asked, and was permitted, to represent himself with an appointed lawyer

serving actively as co-counsel—a luxury unavailable to most *pro se* defendants (who ordinarily are allowed, at a maximum, the safety net of "standby" counsel). Conscious of the need for order, and sensitive to the rights of Wellington's codefendants, the court originally permitted Wellington to assume the role of co-counsel on condition that Boudreau would conduct the defense. After Wellington made it known that he desired to act as lead counsel with Boudreau's assistance, the trial court relaxed the protocol and attempted to adjust courtroom procedures to accommodate defendant's unusual request. The condition imposed—that Wellington interrogate himself as well as the other witnesses—was not so unreasonable as to demand our intervention.

Appellant urges that, if two attorneys were sharing the load, they would probably have been permitted to alternate in the examination of successive witnesses. Yet, that asseveration compares plums with pomegranates. It strikes us as patently unfair to equate the Wellington/Boudreau tandem with trial representation by two attorneys. When a litigant elects to exercise his right of self-representation, the burden on the trial judge increases exponentially. He must not only safeguard the orderly processes of trial against the incursions of a neophyte, but must take on an added responsibility for protecting the defendant from the consequences of his own folly. *See, e.g., Grubbs v. State,* 255 Ind. 411, 265 N.E.2d 40, 44 (1970); *see also* Comment, 72 Calif. L.Rev. 697, 709–13 (1984). All too often, a *pro se* criminal defendant will, whether by inadvertence or design, test the limits of the court's patience and ingenuity in reconciling unorthodox courtroom tactics with the procedural guarantees of the fifth, sixth, and fourteenth amendments. *See, e.g., Mayberry v. Pennsylvania,* 400 U.S. 455, 462–63, 91

S.Ct. 499, 503–04, 27 L.Ed.2d 532 (1971); *United States v. Pina,* 844 F.2d 1, 5 (1st Cir.1988); *see generally Faretta,* 422 U.S. at 852, 95 S.Ct. at 2549 (Blackmun, J., dissenting). In a case like this one, the judicial burden is heavier still, for other defendants were on trial—all of whom voiced understandable concern that Wellington's conduct might redound to their detriment. Thus, the court had to ensure that, in granting Wellington his due, the codefendants' rights were not impaired. An accused in a multi-defendant case has no right to demand that the court rob Peter to pay Paul. For these reasons, the defendant's situation cannot fairly be compared with one in which two lawyers represent a single client.

Certain other factors also counsel against a finding that discretion was abused or rights emasculated. For one thing, we see nothing so intrinsically ineffectual about the technique favored by the district court as should bar it from the array of choices available to a trial judge. Though not ideal, self-examination does adequately permit a defendant to tell his side of the story, that is, to testify in his own defense. For another thing, Wellington lost the full benefits of self-examination not because of the court's impositions, but by his own wilfulness. No rulings of the court caused Wellington to relinquish the stand. The defendant asked himself only one question. That question was plainly improper and the volunteered answer to it was correctly stricken. It was defendant's (unilateral) decision to proceed no further,[7] thereby waiving his rights. It is relevant, too, that at the time Wellington finally decided to testify, his proposal for conducting direct examination differed substantially from the procedure he had previously requested (and to which he now retreats). On the day defendant took the stand, the

**7.** Wellington's parting remark ("I guess I can't ask myself any more questions then") suggests only that he viewed the objectionable question and answer as a necessary predicate for any further testimony. It is interesting to note that Wellington made a similar remark when objections to his cross-examination of an earlier witness were repeatedly sustained, saying: "I guess I can't ask this witness any questions then." The court told Wellington on that occasion that he could "ask as many questions as [you] want[ ], providing they are within the rules." Nevertheless, Wellington went no further. In both instances, it seems, Wellington made a conscious choice to discontinue the examination for reasons unrelated to format.

suggestion that Boudreau examine him did not emerge at all. Instead, Wellington told the court that direct examination by the jurors was "the only way I can have a fair trial," and that he would not testify otherwise. Given that ultimatum, it is harder to fault the court for insisting upon self-interrogation as the option of choice.

In such ramified, hard-to-manage circumstances, appellate courts should cede a full measure of discretion to beleaguered trial judges. Justice may well require that balances be struck and reasonable procedural accommodations fashioned. While insisting that Wellington pose his own questions may have fallen near the margin of the court's discretion, we are unwilling to say that the order crossed into forbidden terrain. And, as to our concurring brother's suggestion that "the district judge should have taken [further] steps, *sua sponte*, to protect Wellington's interests," *post* at 1128, there was simply no such duty. As we heretofore wrote in rejecting an analogous argument (that a district court committed reversible error by not directing defense counsel, *sua sponte*, to consider moving for changed venue): "We refuse needlessly to increase the heavy burdens already imposed on trial judges in criminal cases." *United States v. Reveron Martinez*, 836 F.2d 684, 687 (1st Cir.1988). For these reasons, we will not disturb the challenged ruling.[8]

2. *Interrogation by the Jury.* Wellington's claim of testimonial preclusion has a second furculum as well. He asseverates that the district court should have permitted the venire to question him. This initiative need not occupy us for long.

■ Jurors' interrogation of witnesses, although perhaps coming into vogue, *see* Sherman, *Wider Role for Jurors Studied*, 11 Nat'l L.J. 3 (July 10, 1989), has only occasionally been permitted in federal courts. At most, use of such a mechanism rests in the trial court's discretion. *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 515–17 (4th Cir. 1985) (juror questioning is within trial court's discretion, although the practice is "fraught with dangers which can undermine the orderly progress of the trial to verdict"); *United States v. Callahan*, 588 F.2d 1078, 1086 n. 2 (5th Cir.) ("proper handling" of questioning by jurors discretionary with trial court), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *United States v. Witt*, 215 F.2d 580, 584 (2d Cir.) (examination by jurors is "a matter within the judge's discretion"), *cert. denied*, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954). The Fourth Circuit has written that, absent compelling circumstances, "the potential risk that a juror question will be improper or prejudicial is simply greater than a trial court should take." *DeBenedetto*, 754 F.2d at 516. Such risks are compounded in a criminal case, and compounded yet again where multiple defendants are tried together. It seems foolhardy to suggest that a judge in a multiple defendant criminal case must freely allow jurors to question a witness where one defendant—and one defendant alone—has invited such interrogation. The court acted neither improperly nor unwisely in denying Wellington's request.[9]

### D. *The Tape.*

■ After Wellington's arrest, a number of interested parties met in Los Angeles to discuss the legitimacy of MBT, and whether it could be salvaged. Halleuer taped the meeting by means of a concealed recorder. Wellington attempted to introduce the tape and/or a transcript, or por-

---

8. It is significant, we think, that the only other appellate court which to our knowledge has faced a comparable problem, the highest court of the state of New York, concluded that a trial judge did not abuse his discretion in refusing a defendant's request that standby counsel question him on direct examination. *See People v. Garcia*, 69 N.Y.2d 903, 516 N.Y.S.2d 194, 194–95, 508 N.E.2d 929, 929–30 (1987) (per curiam).

9. We limit our analysis to jury questions put directly to a witness, as Wellington requested. We express no disapproval of procedures whereby the judge questions a witness on a point about which the jurors, through a written communication to the court, have expressed curiosity or confusion. *See Callahan*, 588 F.2d at 1086.

tions thereof, as evidence. The government and the codefendants objected.

The proffered material was properly excluded. First, it was hearsay. Second, Wellington was not present at the meeting. Third, no suitable foundation was laid for admitting the tape or transcript; neither was authenticated by any participant in the session. Fourth, the judge's conclusion that the evidence was irrelevant seems fully supportable; after all, the meeting took place in Wellington's absence and after his arrest. Fifth, the court found the recording "confusing," and ruled that its prejudicial impact outweighed its probative value. These findings, too, are grounded in the record and well within the court's wide discretion. *See Freeman,* 865 F.2d at 1340; *see also* Fed.R.Evid. 403. There was no error.

## IV. THE JOINT CLAIMS

Nivica and Wellington join in challenging (1) the district court's instruction on the "good faith" defense, and (2) the admission of certain documentary exhibits. We address these challenges *seriatim.*

### A. *Jury Instructions.*

We review the denial of requests to charge on a specific defense in light of "the record as a whole and the charge as given." *New England Enterprises, Inc. v. United States,* 400 F.2d 58, 71 (1st Cir. 1968), *cert. denied,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). Bearing in mind that judges need not parrot the precise wording of a defendant's proffered

instructions, *United States v. Coast of Maine Lobster Co.,* 557 F.2d 905, 909 (1st Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977), we perceive no error in the district court's handling of the good faith issue.

We have set forth the pertinent portions of the court's instructions in the margin.[10] The charge plainly communicated the substance of defendants' requested instruction—that good faith constituted a defense—insofar as necessary. *See New England Enterprises,* 400 F.2d at 71 (when defendant requests a good faith instruction, it suffices if the court charges clearly on specific intent, thereby transmitting the gist of the request).

We acknowledge that two circuits seem to have embraced more exacting requirements for charging a jury on good faith. *See United States v. Casperson,* 773 F.2d 216, 222–24 (8th Cir.1985); *United States v. Hopkins,* 744 F.2d 716, 717–18 (10th Cir.1984) (en banc). Yet, the gulf is not as wide as defendants say. These cases merely hold that, where the charge makes no mention of good faith, a standard instruction on specific intent is insufficient to submit the substance of the defense to the jury. *See Casperson,* 773 F.2d at 223; *Hopkins,* 744 F.2d at 718.[11] Here, in contrast, the district judge specifically focused upon, and explained, the good faith defense, *see supra* note 10. His instructions communicated the essence of the defense in a fashion that should pass muster before any circuit. *See Hopkins,* 744 F.2d at 718.

**10.** The court charged in manner following:
[T]here must be shown participation and intent to participate. That is, the government must prove beyond a reasonable doubt that each defendant participated and acted knowingly with an intent to deceive or defraud. A defendant doesn't act with intent to deceive or defraud by accidentally doing something or mistakenly doing something or doing something in good faith. Being in the wrong place at the wrong time, happening to be at a certain place at a certain time, does not make a defendant a willing, active participant. A defendant must act knowingly with intent to defraud.
Fraudulent intent is never assumed or presumed. It is personal intent. One can be

charged only with what that person intends, not the intent of some other persons. Bad faith is essential. Good faith is a defense.
One who acts with honest intentions, mistake, accident, inadvertence cannot be charged with fraudulent intent. Fraudulent intent, as I said here, is established when the person knowingly and intentionally attempts to deceive another, that that person is chargeable with fraudulent intent even though that person may be unaware of the exact manner and the exact form in which that deception or the entire scheme is to take place.

**11.** That is not the law of this circuit. *See New England Enterprises,* 400 F.2d at 71.

To the extent that *Casperson* and *Hopkins* stand for a rule different than that of *New England Enterprises*, we refuse to follow them. First, *New England Enterprises* reflects the general maxim, often endorsed by the Supreme Court and by us, that jury instructions should be read not in isolation but in the context of the charge as a whole. *See, e.g., United States v. Park,* 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975); *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *United States v. Serino,* 835 F.2d 924, 930 (1st Cir.1987); *Cintolo,* 818 F.2d at 1003. Second, *New England Enterprises* represents the majority view, adhered to by this court and most federal appellate courts which have considered the issue. *See, e.g., United States v. Hunt,* 794 F.2d 1095, 1097–98 (5th Cir.1986); *United States v. Green,* 745 F.2d 1205, 1209 (9th Cir.1984), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985); *United States v. McGuire,* 744 F.2d 1197, 1201–02 (6th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985); *United States v. Gambler,* 662 F.2d 834, 837 (D.C.Cir.1981); *see also Coast of Maine Lobster,* 557 F.2d at 909. And third, we believe ourselves bound, in the absence of reconsideration en banc, to follow our established rule. *See Jusino v. Zayas,* 875 F.2d 986, 993 (1st Cir.1989).

## B. *Admission of Documentary Exhibits.*

Appellants rail at the admission of certain summary exhibits through Charles Voukides, an FBI agent. They also inveigh against the admission of certain of the underlying documents upon which the summaries were based. We explore each facet separately.

1. *Summaries.* Using all the testimony and available documents, Voukides compiled schedules purporting to show debits and credits in MBT's accounts. He also prepared summaries of the venture's CD sales, currency exchanges, and total business activity. The summaries indicated that the difference between MBT's receipts and its disbursements amounted to over $6,000,000.

We note at the outset that many, indeed most, of the factual criticisms argued before us were not properly preserved at trial. For that reason, we decline to visit the fact-specific thicket which appellants bid us to enter. *See* Fed.R.Evid. 103(a)(1) (to preserve evidentiary argument for appeal, party must make "a timely objection … stating the specific ground of [that] objection"); *see also United States v. Piva,* 870 F.2d 753, 759 (1st Cir.1989) (same).

Defendants did preserve, and reiterate here, their claim that the summaries should have been excluded because they were misleading. The charts, in defendants' view, did not reflect MBT's total financial activity; failed to identify or explain certain payments; and were prepared from inadequate records. We think that such arguments go to the completeness of the underlying documents, affecting the weight rather than the admissibility of the government's summaries.

■■■■■ The analytic touchstone, of course, is Fed.R.Evid. 1006.[12] A summary admitted under Rule 1006 must be based upon evidence independently established in the record. *See United States v. Drougas,* 748 F.2d 8, 25 (1st Cir.1984); *United States v. Sorrentino,* 726 F.2d 876, 884 (1st Cir. 1984). That threshold was crossed: Voukides testified at length concerning his reliance upon various business records, all of which had been independently admitted into evidence. The witness did not purport to capsulate extra-evidential records of which he had no knowledge, or rely upon unavailable documents.

■■■■ Defendants argue that because MBT's recordkeeping was at times desultory, it is somehow unfair for the government to total only those transactions of

---

**12.** The Rule states in pertinent part:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.

Fed.R.Evid. 1006.

which it has knowledge. But, we think the shoe fits the other foot. It would be manifestly unfair to place the prosecution in an epistemological quandary, requiring it to prove a negative (*i.e.,* that no further records exist). So long as the government, exercising due diligence, collects whatever records are reasonably available and succeeds in introducing them, it may be permitted (subject, of course, to relevancy and perscrutation under Fed.R.Evid. 403) to summarize the data it has managed to obtain. If defendants possessed exculpatory records not in the government's files, they could have offered them at trial or prepared their own summary. By the same token, if there were gaps in the charts, the defense—knowledgeable as to MBT's operation—had every opportunity to exploit them. In the last analysis, completeness of the underlying records was for the jury.

Inasmuch as the summary charts were adequately grounded in the evidence, their admissibility was committed to the district court's sound discretion. *See United States v. Norton,* 867 F.2d 1354, 1362 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989); *United States v. Campbell,* 845 F.2d 1374, 1381 (6th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988). Given the court's careful instructions (which ensured that the summaries' nature and purpose, and their limitations, were placed in proper perspective), the ability of both jury and defense counsel to examine the supporting records, and Voukides' availability for cross-examination, misuse of that discretion has not been shown. *See, e.g., Norton,* 867 F.2d at 1363; *Campbell,* 845 F.2d at 1381; *United States v. Catabran,* 836 F.2d 453, 458 (9th Cir.1988); *Sorrentino,* 726 F.2d at 884.

**2.** *Bus Documents.* Wellington and Nivica challenge the admissibility of the so-called "bus documents."[13] The chain of custody, though unusual, was established by competent testimony, and need not be traced. After the documents came into the lawful possession of Patricia Larkin, a federal agent, they were reviewed and identified by MBT's treasurer, Velasco. Following Larkin's testimony, the trial judge made an express finding that the papers were adequately authenticated and ruled them admissible under the business records exception.[14]

Appellants heatedly contest this ruling. Their challenge appears meritorious. Although a government investigator may be a "qualified witness" for the purpose of laying a foundation under Rule 803(6), *see United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(6)[02] (1988) at 803–178, Larkin confined her testimony to the chain of custody and did not treat with the circumstances surrounding the bus documents' preparation. The government does not suggest that Larkin was competent to "explain and be cross-examined concerning the manner in which the records [were] made and kept." *Wallace Motor Sales v. American Motor Sales Corp.,* 780 F.2d 1049, 1061 (1st Cir.1985). In any event, she never testified that the records were prepared in the course of a regularly conducted business activity, or that it was MBT's standard practice to compile such paperwork. Nor does the United States point to testimony from any other source sufficient to cure the omission. In light of these lacunae, we do not think the court's stated reason for admitting the evidence withstands scrutiny.

---

**13.** The agnomen stems from a link in the chain of custody: at one point, the disputed documents, comprising some or all of the bank's Mexican records, were transshipped from McAllen, Texas to Los Angeles, California by Trailways bus.

**14.** This exception excludes from the "hearsay" category:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information trans-

mitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed.R.Evid. 803(6).

■ This is not the end of the matter. Notwithstanding the prosecution's failure to bring the bus documents within the borders of Rule 803(6), we believe they were admissible. In addition to proffering the documents as business records, the prosecution also offered them, alternatively, under the residual hearsay exception contained in Fed.R.Evid. 803(24).[15] Although we recognize that Rule 803(24) should be used stintingly, its requirements were met on this occasion. The evidence was relevant and material. The government gave the requisite advance notice to the defendants. There is nothing in the nisi prius roll to suggest that the records were other than what they purported to be. The district court concluded (supportably, we think) that the bus documents were "authentic.... documents of the Defendant [MBT]"; that the documents were reliable and trustworthy; and that, given the provenance and character of the materials, their admission was justified. The bus documents' status as the best—indeed, the only—available proof of MBT's daily financial activity in Mexico was irrefragable. The interests of justice appear well served by their admission. Appellants' rights were not unfairly compromised. *See Karme v. Commissioner,* 673 F.2d 1062, 1064–65 (9th Cir.1982) (although Rule 803(6) did not justify admission of bank records because proof was lacking that they were kept in the course of a regularly-conducted business activity, court had discretion to admit them under Rule 803(24)).

■ To be sure, the district court acted under the "wrong" rule. But, the bevue was not fatal. If the trier incorrectly admits evidence under a hearsay exception, we will not reverse so long as the material was properly admissible for the same purpose under a different rule of evidence.

*See, e.g., United States v. Beltran,* 761 F.2d 1, 9 (1st Cir.1985); *cf., e.g., United States v. Mora,* 821 F.2d 860, 869 (1st Cir. 1987) (where district court has supportably "made the key findings of fact" but applied the wrong rule of law, court of appeals need not remand, but may simply regroup the findings "along the [proper] matrix"); *Chongris v. Board of Appeals,* 811 F.2d 36, 37 n. 1 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987) (appellate court need not accept district court's reasoning, but may affirm judgment on any independently sufficient ground supported by the record). In this case, the district court's factual findings, bulwarked by record evidence, leave no doubt that the government's proffer of the bus documents under Rule 803(24) was solidly grounded.

## V. THE FINAL CURTAIN

We need go no further. Having chronicled the swift rise and meteoric fall of MBT, and weighed appellants' sundry contentions against the record and the applicable law, we discern no reversible error. Inasmuch as Nivica and Wellington were fairly tried and justly convicted, the judgments below must stand. The show has closed.

*Affirmed.*

REINHARDT, Circuit Judge, concurring:

In light of Justice Brennan's concurrence in *Luce v. United States,* 469 U.S. 38, 43–44, 105 S.Ct. 460, 464, 83 L.Ed.2d 443 (1984), I question the ultimate correctness of my colleagues' disposition of the motion *in limine* issue. In his concurrence, Justice Brennan stated that the *Luce* holding should be limited to rulings involving Rule

---

**15.** That proviso excludes from the "hearsay" category:

A statement not specifically covered by any [other] exception[ ] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 803(24).

609(a), and noted that in cases where "the determinative question turns on legal and not factual considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate." *Id.* at 44, 105 S.Ct. at 464. There is, in my view, considerable merit to Justice Brennan's position. However, two subsequent First Circuit cases, *United States v. Griffin*, 818 F.2d 97 (1st Cir.1987) and *United States v. Mazza*, 792 F.2d 1210 (1st Cir. 1986), have interpreted *Luce* broadly. They implicitly reject the approach taken by Justice Brennan and appear to have foreclosed the issue in this circuit. For this reason, I agree that my colleagues have properly applied the precedent which must govern our decision here.

On the right to testify question, I concur, again with considerable reluctance, in the result reached by the majority. Wellington made it clear that he wished to act as his own counsel. Subsequently, the judge explicitly stated that Wellington would be required to question all of the witnesses, including himself. When Wellington took the stand to testify, he asked if the *jury* could question him, a request which was denied by the court. Even after the court's adverse ruling, Wellington did not request that his co-counsel be permitted to question him. Rather, at that point he proceeded to question himself. When the objection to his first question was sustained, Wellington appeared to be totally confused and chose not to ask himself any more questions. Once again, however, he did not ask the court to permit his co-counsel to conduct the questioning. Under these circumstances, I cannot conclude that the district judge committed reversible error.

Nevertheless, I believe that the district judge should have taken steps, *sua sponte*, to protect Wellington's interests in securing a fair trial. The right to testify in one's own defense is a fundamental constitutional right, *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987), *United States v. Martinez*, 883 F.2d 750, 754 (9th Cir.1989), and Wellington's attempt to offer his own testimony, by means of self-questioning, was obviously a total failure. At that point, I believe that

the judge should have inquired of Wellington whether he would be interested in having his original attorney conduct the examination, since that attorney had subsequently been appointed to serve as Wellington's co-counsel and was present in the courtroom for the purpose of providing him with legal assistance. Although the judge had previously stated that only one "counsel," Wellington, would be permitted to question of the witnesses, given Wellington's subsequent performance, the judge should have been willing to reconsider that ruling, at least with respect to Wellington's own testimony. In my opinion, a willingness on the part of the district court to explore alternative methods of enabling Wellington to testify in his own defense, and a sensitivity to the difficulties presented by the defendant's attempt to elicit essential testimony through self-questioning, would have better served the interests of justice and afforded greater protection to the important constitutional right at stake.